STATE EX REL. METCALF, RELATOR, v. DISTRICT COURT
ET AL., RESPONDENTS.

(No. 3,789.)

(Submitted January 10, 1916.   Decided February 9, 1916.)

[155 Pac. 278.]

*Certiorari—Contempt of Court—Newspapers—Freedom of Press
—Libelous Publication—Court Proceedings.*

Contempt of Court—Power to Punish.
  1.   The power to punish for contempt is inherent in courts of record,
  and a necessary incident to the exercise of judicial functions.
Same—Statutory Provisions not Exclusive.
  2.   The enumeration of certain acts as contempts in Section 7309, Re-
  vised Codes, is not exclusive.
Same—Newspapers—Libelous Publication—Freedom of Press.
  3.   *Held,* on *certiorari,* that publication of an article in a newspaper in
  effect charging a district judge with wrongdoing in connection with his
  decision in a cause disposed of by him six months before, did not con-
  stitute contempt of court, under Section 8275, Revised Codes, but fell
  within the constitutional provision guaranteeing the liberty of the press,
  for a violation of which privilege the law provides redress for libel by
  civil, or punishment by criminal, action.
    [As to inherent power of court to punish for contempt in the case of
  newspaper publications, see note in 50 Am. St. Rep. 573.]

Original application for writ of *certiorari* by the State, on
the relation of George L. Metcalf, against the District Court of
the Fourth Judicial District of the State in and for Ravalli
County, and R. Lee McCulloch, the judge thereof, to review
proceedings resulting in a judgment adjudging relator guilty
of contempt of court.   Judgment annulled.

*Messrs. Johnson & Tucker* and *Mr. Park Smith,* for Relator,
submitted a brief; *Mr. L. O. Johnson* argued the cause orally.

The weight of authority and the trend of modern decisions sus-
tains the position that since the cases in question were not pend-
ing, the relator had the right to make such comments and reason-
able criticism of the court and its rulings as he deemed fit.   (*State
ex rel. Ashbaugh* v. *Circuit Court,* 97 Wis. 1, 65 Am. St. Rep.

As to effect of personal criticism of or insult to court because of de-
cision after determination of cause, see note in 17 L. R. A. (n. s.) 585.

90, 38 L. R. A. 554, 72 N. W. 193; *Percival* v. *State,* 45 Neb. 741,
50 Am. St. Rep. 568, 64 N. W. 221; *Rosewater* v. *State,* 47 Neb.
630, 66 N. W. 640; *State* v. *Sweetland,* 3 S. D. 503, 54 N. W.
415; *State* v. *Edwards,* 15 S. D. 383, 89 N. W. 1011; *In re
Pryor,* 18 Kan. 72, 26 Am. Rep. 747; *In re Dalton,* 46 Kan.
253, 26 Pac. 673; *In re Thompson,* 46 Kan. 254, 26 Pac. 674;
*Cheadle* v. *State,* 110 Ind. 301, 59 Am. Rep. 199, 11 N. E. 426;
*Cooper* v. *People,* 13 Colo. 337, 373, 376, 6 L. R. A. 430, 443,
22 Pac. 790, 802; *Field* v. *Thornell,* 106 Iowa, 7, 68 Am. St. Rep.
281, 75 N. W. 685; *State* v. *Bee Pub. Co.,* 60 Neb. 282, 83 Am.
St. Rep. 531, 50 L. R. A. 195, 83 N. W. 204; *Ex parte McLeod,*
120 Fed. 130; *Dunham* v. *State,* 6 Iowa, 245; *Fishback* v. *State,*
131 Ind. 304, 30 N. E. 1088; *State* v. *Anderson,* 40 Iowa, 207;
*Ex parte Green,* 46 Tex. Cr. 576, 108 Am. St. Rep. 1035, 66
L. R. A. 727, 81 S. W. 723; *People* v. *Wilson,* 64 Ill. 195, 16
Am. Rep. 528; *Storey* v. *People,* 79 Ill. 45, 22 Am. Rep. 158;
*State Board of Law Examiners* v. *Hart,* 104 Minn. 88, 15 Ann.
Cas. 197, 17 L. R. A. (n. s.) 585, 116 N. W. 212.)

*Mr. W. H. Poorman,* Assistant Attorney General, for Respondents, argued the cause orally.

MR. JUSTICE HOLLOWAY delivered the opinion of the
court.

In May, 1915, George L. Metcalf instituted proceedings in the
district court to oust C. W. Ward from his office as county commissioner of Ravalli county. A demurrer to his complaint was
sustained, and a judgment of dismissal entered. A like proceeding against N. J. Tillman was disposed of in like manner. In
November following Metcalf caused to be published in the
"Western News," a newspaper of general circulation in Ravalli
county, a tirade of vilification and abuse directed at the county
commissioners, the county attorney, and Honorable R. Lee McCulloch, the judge who presided in the Ward and Tillman cases.
The publication is altogether too lengthy to be reproduced. In
effect it charged the county commissioners with looting the pub-

lic treasury, and was apparently intended to charge Judge Mc-Culloch with being in league with them, or at least quiescent or insensible to their wrongdoing. Metcalf was attached for contempt, tried, found guilty, and a fine imposed. At his instance a writ of *certiorari* was issued from this court, and the contempt proceedings are before us for review.

The causes to which the publication referred had been finally determined some time before the article was published; but the references to Judge McCulloch were not merely personal to him but related to his character as judge of the district court. One reference follows: "My first case was thrown out of court on a technicality, and again I brought suit. The judge threw it out of court, characterizing it as 'a dirty mess.' If a man takes a horse or a few head of cattle that do not belong to him, he goes to Deer Lodge [penitentiary]; but when two of our commissioners take $683.90 of the county's money, that is simply 'a dirty mess.'"

The right to punish for contempt is as old as the law itself.
[1] It is a power inherent in the courts of record of this state, is a part of their very life, and a necessary incident to the exercise of judicial functions. (*Territory* v. *Murray*, 7 Mont. 251, 15 Pac. 145; *In re Mettler*, 50 Mont. 299, 146 Pac. 747; *State ex rel. Boston & Mont. etc. Min. Co.* v. *Clancy*, 30 Mont. 193, 76 Pac. 10.) The legislature of this state has never undertaken to abridge the powers of the courts created by the Constitution to punish any act which would constitute contempt at common
[2] law. In section 7309, Revised Codes, certain acts are denounced as contempts, but that the enumeration was not intended to be exclusive is manifest, for in section 8275 other acts are referred to as constituting contempts, which are not mentioned in section 7309.

The publication of a false or grossly inaccurate report of the
[3] proceedings of a court constituted contempt at common law (4 Blackstone, 285), and section 3552, Revised Codes, declares: "The common law of England, so far as it is not repugnant to or inconsistent with the Constitution of the United

States, or the Constitution or laws of this state, or of the Codes, is the rule of decision in all the courts of this state." The qualifications in this section, however, are of equal moment with the principal text.   Many of the rules of the common law, however admirably adopted to monarchical England during the seventeenth or eighteenth century, are altogether out of harmony with the spirit of our democratic institutions and inapplicable to present-day conditions; and this is particularly true of the law of contempt.   After enumerating seven classes of acts, any one of which constitutes contempt, Blackstone then adds a general saving clause, in which he includes as a contempt: "Anything, in short, that demonstrates a gross want of that regard and respect which, when once courts of justice are deprived of, their authority (so necessary for the good order of the kingdom) is entirely lost among the people." (4 Blackstone, 285.)

In *Roach* v. *Garvan* (*St. James Evening Post Case*), 2 Atk. 469 (26 Eng. Reprint, Chap. 683), Lord Hardwicke said: "There are three different sorts of contempt.   One kind of contempt is scandalizing the court itself.   There may be likewise a contempt of this court in abusing parties who are concerned in causes here.   There may be also a contempt of this court in prejudicing mankind against persons before the cause is heard."

There is not any doubt that the publication of scandalous matter concerning a court constituted contempt at common law, irrespective of whether the publication related to a case pending; but, unless it did relate to a cause before the court, it was treated as contempt only because it tended to bring the court into disrespect, or, in other words, to scandalize the court.   The rule has been adopted and applied in a few instances in this country.   (*Commonwealth* v. *Dandridge*, 2 Va. Cas. 408; *Burdett* v. *Commonwealth*, 103 Va. 838, 106 Am. St. Rep. 916, 68 L. R. A. 251, 48 S. E. 878; *State* v. *Morrill*, 16 Ark. 384; *State* v. *Hildreth*, 82 Vt. 382, 137 Am. St. Rep. 1022, 18 Ann. Cas. 661, 24 L. R. A. (n. s.) 551, 74 Atl. 71; *In re Moore*, 63 N. C. 397.)

Although the question was not presented, the supreme court of Michigan and the supreme court of Missouri each announced by *obiter dictum* its adherence to the same rule. (*In re Chadwick,* 109 Mich. 588, 67 N. W. 1071; *Crow* v. *Shepherd,* 177 Mo. 205, 99 Am. St. Rep. 624, 76 S. W. 79.) So far as our investigation goes, these are the only American decisions which assume to follow the common law to the extent of holding a libelous publication concerning a court or judge contempt of court irrespective of whether the publication referred to proceedings pending in court; and in each instance justification for the conclusion is found in the rule announced by Lord Hardwicke, that matters which tend to scandalize the court will constitute contempt.

In *Ex parte McLeod,* 120 Fed. 130, the United States district court for the district of Alabama treated as contempt an assault upon a United States commissioner because of his official act, although the assault did not occur in the presence of the court, or in any manner interfere with court proceedings. This case is *sui generis.*

In *State ex rel. Haskell* v. *Faulds,* 17 Mont. 140, 42 Pac. 285, this court had before it a publication concerning cases then pending in court, and determined that the publisher was guilty of contempt. The court declined to consider whether the same publication concerning cases finally determined would or would not constitute contempt, but for some reason not apparent quoted at considerable length from *State* v. *Morrill,* above.

The common law of England is not our birthright. To whatever extent it has been in force, it was and is ours by adoption and not by inheritance. The territory embraced within this state was not a British possession in colonial days, and came under the influence of the common law only by virtue of an Act of the first legislative assembly which provided: "That the common law of England, so far as the same is applicable and of a general nature, and not in conflict with special enactments of this territory, shall be the law and the rule of decision, and shall be considered as of full force until repealed by legislative author-

ity.'' (Bannack Statutes, p. 356.)   That statute remained in force throughout the territorial *régime* (sec. 201, 5th Div. Comp. Stats. 1887), was modified by the Constitution, and projected upon the state by section 1, Article XX, restated, but not materially changed, in section 5152, Political Code, and section 3552, Revised Codes, and in that form is a part of the law to-day.   It is doubtful whether the law of contempt as understood in England at the time of the Revolution was ever in full force and effect in any American state, and certainly it was not in Montana, for long before the organization of the territory it had been greatly modified by the Fox Libel Act, by other Acts of parliament, by decisions of the courts, and by disuse.

It is worthy of note that, while some of our courts have recently adhered to the rule announced by the high court of chancery in 1742, in England, where it had its origin, it has long since fallen into a state of innocuous desuetude.   In 1899, in *McLeod* v. *St. Aubyn,* 68 L. J. R. 137, the Judicial Committee of the Privy Council, after referring to the law of contempt as stated by Lord Hardwicke, said: ''Committals for contempt of court by scandalizing the court itself have become obsolete in this country.   Courts are satisfied to leave to public opinion attacks or comments derogatory or scandalous to them.''   There is nothing in *Rex* v. *Gray,* 2 Q. B. 36, 69 L. J. R. (n. s.) 502, to indicate a contrary view.

The history of the legislation regulating the power to punish for contempt in the federal courts, other than the supreme court, is indicative of the trend of public opinion upon this subject. In 1826 James H. Peck, United States district judge for the district of Missouri, imposed severe punishment upon Luke Lawless, an attorney, for publishing an article criticising one of his decisions.   When the matter was called to the attention of the House of Representatives, Judge Peck was impeached, but, upon trial before the Senate, he was acquitted.   The Congress, however, immediately enacted what is now section 725, United States Revised Statutes, which attaches the following

proviso to the authority granted federal courts to punish for contempt: "*Provided,* that such power to punish contempts shall not be construed to extend to any cases except the misbehavior of any person in their presence, or so near thereto as to obstruct the administration of justice, the misbehavior of any of the officers of said courts in their official transactions, and the disobedience or resistance by any such officer, or by any party, juror, witness, or other person, to any lawful writ, process, order, rule, decree, or command of the said courts." And the power was further curtailed by the Clayton Act (Act Oct. 15, 1914, Chap. 323, 38 Stat. 730, Fed. Stats. Ann. 1915, Pamphlet Supp., p. 118).

The supreme court of North Carolina has recently receded from the position taken in the *Moore Case* above. While challenging the authority of the legislature to destroy or sensibly impair the power of a court to punish for contempt, the court treated a recent statute of that state upon the subject of contempt as follows: "Having reference to the history of this statute, the context, and the language employed, it was clearly the purpose and meaning of the Act to restrict the power of the court, in this last respect, to the publication of grossly inaccurate reports about a trial or other matter *still pending,* and, this being in our view the proper and only permissible occasion for the exercise of such a power in reference to these publications, we are of opinion that the provision of the statute should, in this respect, be upheld as written, and the power to punish summarily for defamatory reports and criticisms, about a matter that is past and ended, no longer exists." (*In re Brown,* 168 N. C. 417, 84 S. E. 690.)

In 6 Ruling Case Law, 512, the modern American doctrine is tersely stated as follows: "At common law the mere writing contemptuously of the judge of a superior court was a constructive contempt, but this doctrine has not been fully adopted in this country and has been limited by our constitutional guaranties of free speech and liberty of the press to pending cases. The common-law rule was founded on the obsequious and flatter-

ing principle that a judge was the representative of the king, but the theory of government which invests royalty with an imaginary perfection, and which forbids question or discussion, is diametrically opposed to the principles of a free and popular government, in which the utmost latitude and liberty in the discussion of business affecting the public and the conduct of those who fill positions of public trust, that is consistent with truth and decency, is not only allowable, but is essential to the public welfare.'' And the text is amply sustained by the authorities. (9 Cyc. 20; Rapalje on Contempt, sec. 56; 7 Ency. Law, 2d ed., 61; 2 Cooley on Torts, p. 820; 2 Bishop on Criminal Law, sec. 259; *Cheadle* v. *State,* 110 Ind. 301, 59 Am. Rep. 199, 11 N. E. 426; *State* v. *Kaiser,* 20 Or. 50, 8 L. R. A. 584, 23 Pac. 964; *State* v. *Tugwell,* 19 Wash. 238, 43 L. R. A. 717, 52 Pac. 1056; *In re Pryor,* 18 Kan. 72, 26 Am. Rep. 747; *Cooper* v. *People,* 13 Colo. 337, 373, 6 L. R. A. 430, 22 Pac. 790; *State* v. *Bee Pub. Co.,* 60 Neb. 282, 83 Am. St. Rep. 531, 50 L. R. A. 195, 83 N. W. 204; *State Board of Law Examiners* v. *Hart,* 104 Minn. 88, 15 Ann. Cas. 197, 17 L. R. A. (n. s.) 585, 116 N. W. 212; *Storey* v. *People,* 79 Ill. 45, 22 Am. Rep. 158; *Field* v. *Thornell,* 106 Iowa, 7, 68 Am. St. Rep. 281, 75 N. W. 685; *Ex parte Green,* 46 Tex. Cr. 576, 108 Am. St. Rep. 1035, 66 L. R. A. 727, 81 S. W. 723; *State ex rel. Ashbaugh* v. *Circuit Court,* 97 Wis. 1, 65 Am. St. Rep. 90, 38 L. R. A. 554, 72 N. W. 193; *In re Cooke,* 116 La. 723, 41 South. 49; *In re Brown,* above.)

The framers of our Constitution recognized, without limiting, the power of the courts to punish for contempt (sec. 3, Art. VIII); but they understood the law of contempt to be a law of necessity, and its exercise in any given instance to be measured and restricted by the necessity which calls it into existence. The purpose to be subserved by investing our courts with such extraordinary power is to enable them to maintain order and decorum, compel respect for their lawful orders and process, and enable them to investigate and determine the causes before them without let or hindrance from any extraneous sources. Any publication which tends to interrupt the due course of

judicial administration deserves rebuke. But our Constitution provides: "No law shall be passed impairing the freedom of speech; every person shall be free to speak, write or publish whatever he will on any subject, being responsible for all abuse of that liberty." (Constitution, sec. 10, Art. III.)

It cannot be that liberty of the press means only the right to publish laudatory matter concerning a court or judge, but that as to their shortcomings or demerits there must be profound silence. In the language of a distinguished jurist: "No such divinity doth hedge about a judge."

The publication of a false, or grossly inaccurate, report of the proceedings of a court, constitutes contempt of court, and subjects the offender to prosecution in a criminal action for a misdemeanor. (Rev. Codes, sec. 8275.) Standing alone, the language might be deemed sufficiently comprehensive to include comments upon cases finally determined; but it is to be remembered that the provision first found its way into the statutes of this state in 1895, and therefore is to be construed in the light of our constitutional guaranties, the decisions of courts generally, and the fact that the section does not undertake to define contempts but only to designate certain contempts as crimes. The most cogent reason exists for restraining a false publication concerning matters pending in court, where the administration of the law may be impeded or justice actually defeated, and the interests of the public are sufficiently involved to warrant classifying such a contempt as a crime. But we cannot believe that the legislature ever intended to denounce as a crime every false or grossly inaccurate report concerning causes finally determined, when no public interest can suffer as a consequence of the publication.

If it be contempt of court and a crime to publish a false report concerning a cause finally decided a week or a month ago, the offense is equally as great if the false report concerned the proceedings taken in the most trivial cause a year ago. To say that the plaintiff was successful in the case of *A.* v. *B.*, when in fact the defendant prevailed, would be a false report of the pro-

ceedings in that case; but no one would venture to suggest that the publisher of such report is guilty of contempt of court and of a misdemeanor.

The publication by this relator is hardly susceptible of classification as a report of court proceedings. If it offends, it is because it libels the judge and scandalizes the court; but the offense of ''scandalizing the court,'' as understood at common law, is unknown to our jurisprudence, particularly since the adoption of the Constitution, and ample provision is made for redress for libel, by civil action. The supreme court of Kansas has said: ''No judge, and no court, high or low, is beyond the reach of public and individual criticism. After a case is disposed of, a court or judge has no power to compel the public, or any individual thereof, attorney or otherwise, to consider his rulings correct, his conduct proper, or even his integrity free from stain, or to punish for contempt any mere criticism or animadversion thereon, no matter how severe or unjust.'' (*In re Pryor,* above.)

And the supreme court of the United States declared: ''When a case is finished, courts are subject to the same criticism as other people.'' (*Patterson* v. *Colorado,* 205 U. S. 454, 463, 10 Ann. Cas. 689, 51 L. Ed. 879, 27 Sup. Ct. Rep. 556.)

A court, as such, has no sentient existence. It is only through its administrators that it can be assailed, and every attack necessarily has its personal as well as its official phase. So long as published criticism does not impede the due administration of the law, it were better that we maintain the guaranty of our Constitution than undertake to compel respect or punish libel by the summary process of attachment for contempt. In *Field* v. *Thornell,* above, the supreme court of Iowa said: ''It must be added, however, that the courts have no power or desire to control the press in its legitimate sphere. Its freedom is jealously guarded by the law, and made secure in the Constitution. It enjoys the utmost latitude in reviewing the action of the courts, and may, after the particular litigation is ended, assail,

with just criticism, opinion, rulings, and judgments with the weapons of reason, ridicule or sarcasm.''

The power to punish for contempt is in its nature a trust reposed in the courts, not for themselves, but for the people whose laws they interpret and whose authority they exercise. (*Watson* v. *Williams,* 36 Miss. 331.) While a court which would hesitate to use the power when the circumstances warrant would be guilty of craven faithlessness to duty, it is always to be kept in mind that such power is imperious in its nature and summary in its execution. Under the law as it has been modified to harmonize with the genius of our institutions, the very judge who is libeled may become complainant, prosecutor, witness and judge. It countenances arrest without warrant, trial without jury, and punishment without the right of appeal. It is the nearest approach to autocratic power of any permitted under our form of government, and is not to be extended by implication. To confine its operations within the limits we have indicated will not impair the usefulness of the courts. Libel may still be prosecuted criminally or by civil action. ''Respect to courts cannot be compelled; it is the voluntary tribute of the public to worth, virtue, and intelligence, and whilst they are found upon the judgment seat, so long, and no longer, will they retain the public confidence. If a judge be libeled by the public press, he and his assailant should be placed on equal grounds, and their common arbiter should be a jury of the country; and if he has received an injury, ample remuneration will be made.'' (*Stuart* v. *People,* 3 Scam. (4 Ill.) 395.)

The affidavit does not state facts sufficient to constitute contempt of court, and the judgment of the district court is annulled.

MR. CHIEF JUSTICE BRANTLY and MR. JUSTICE SANNER concur.