CALVIN JACKSON BALL, a Minor, by his next friend, MABEL B. BALL,

*Plaintiff and Appellant,*

vs.

FRANK BALL,

*Defendant and Respondent.*

(No. 2619; April 20th, 1954; 269 Pac. (2d) 302)

For the plaintiff and appellant the cause was submitted upon the brief of John F. Raper and R. G. Diefenderfer, both of Sheridan, Wyoming, and oral argument by Mr. Diefenderfer.

For the defendant and respondent the cause was submitted upon the brief and also oral argument of Henry A. Burgess and Wm. D. Redle, both of Sheridan, Wyoming.

## OPINION

RINER, Justice:

This case presents by direct appeal proceedings an attack upon a judgment of the District Court of Sheridan County. The petition of the plaintiff, Calvin Jackson Ball, an unemancipated minor son and appellant here, was filed July 23, 1952, by his mother, Mabel Ball, as next friend, against his father, Frank Ball, as defendant and respondent in this court. That petition states in its first six paragraphs as follows:

"1.

"That the Plaintiff, Calvin Jackson Ball, herein, is a resident of Lodgegrass, County of Big Horn, State of Montana, and the son of the Defendant herein.

"2.

"That the Plaintiff herein is a minor, being less than Twenty-one (21) years of age, to-wit: nineteen (19) years of age; that this action is brought for and on his behalf by his next friend, Mabel B. Ball, his natural mother.

"3.

"That the Defendant herein was on the 13th day of April, A.D. 1952, the owner of a 1951 Piper PA18 Aircraft, Civil Aeronautics Administration Certificate

No. N1622A and that said Defendant is a duly licensed aircraft pilot.

"4.

"That on the 13th day of April, A.D. 1952, the Defendant herein took as a passenger in said airplane, the Plaintiff, Calvin Jackson Ball, and took off from the airfield at Lodgegrass, Montana, and while piloting said aircraft took the same, together with this Plaintiff, to Hardin, Montana, a distance of about thirty (30) air miles; that upon the return of said aircraft, together with this said Plaintiff and the Defendant, to the airfield at Lodgegrass, Montana, the same crashed in the vicinity of the airfield at Lodgegrass, Montana.

"5.

"That said crash of Defendant's airplane was caused by the negligence of the Defendant in failing to have the gasoline tank of said aircraft full at the time of takeoff or with an adequate supply for the trip from Lodgegrass to Hardin, Montana, and return, with the result that the gasoline supply of said airplane became exhausted just before landing and the Defendant in making a forced emergency landing was further negligent in failing to make a proper dead engine approach to the airfield with the result that he came in too low and stalled the aircraft at a height too far from the ground causing the aircraft to crash with terrific impact on a wing and one wheel.

"6.

"That the Defendant's aircraft was totally demolished by said crash and this Plaintiff suffered severe physical injuries, consisting of shock, cuts on each leg, lacerations on left arm and about the legs, broken teeth, a fractured upper jaw, a severely cut lip, an ugly cut over one eye, a sprained ankle; that as a result thereof, this Plaintiff was hospitalized for a period of

one week in the Sheridan County Memorial Hospital at Sheridan, Wyoming."

The remainder of plaintiff's pleading sets forth certain amounts alleged to be for expenses on account of medical, dental and hospital services; his suffering pain in consequence of such injuries, and also loss of compensation as a part time electrician, a detailed recital of his damages due to the injuries incurred because of the airplane crash aforesaid; these damages are claimed to be for the sum of $49,547. Paragraph 8 of the pleading sets out that defendant holds an aircraft policy of insurance obtained March 22, 1952, from an insurance agent in Sheridan, Wyoming; that demand has been made on the Insurance Company for plaintiff's damages and payment thereof has been refused. Plaintiff's petition concludes with a prayer for judgment against the said defendant for the sum last above mentioned. Attached to said pleading and made a part thereof is a copy of the Insurance policy as Exhibit A. The Insurance Company is not made a party to this action. It will be observed that there is no allegation of wilful or malicious tort, no allegation that the tort was committed in the course of plaintiff's business affairs and nothing appears that would show that the tort was occasioned other than by the son's being a guest of the father in his plane; apparently simply on the desire of the father to afford his son a pleasure ride in the conveyance.

It will be noted that the action in behalf of the son was filed in the office of the Clerk of the District Court of Sheridan County, Wyoming, on July 23, 1952. The summons addressed to the defendant was issued and served the same day in Sheridan, Wyoming. Relative to this matter of service of process it is clear that if the defendant had remained in Montana, process from the

Wyoming court could not have been available to reach him. In respondent's brief it is said: "The insurance company, by its contract must defend the case. In preparing its defense it would find its insured a hostile witness and hostile party, if the parent desires to aid his child. Fraud would be encouraged as when, as here, the father comes from Montana to the Sheridan County Sheriff's office to accept service of process, and then instead of co-operating with the insurance company's attorneys, promptly sues the company, utilizing his son's counsel in this suit, for payment of his son's claim. On the other hand, if the father co-operates willingly with his insurance carrier, strained family relations are a certainty." These facts set out in respondent's brief, though they were stressed at the argument in open court here, were not denied. In this connection we may observe that the insurance policy contains this clause: "The *insured* shall cooperate with *the company* and, upon the *company's* request, shall assist in the recovery of property insured hereunder either by means of replevin proceedings or otherwise, in effecting settlement, securing evidence, obtaining attendance of witnesses, and prosecuting suits to such an extent and in such a manner as is deemed desirable by the *company* * * * " (Italics already supplied.)

To this petition the defendant interposed a general demurrer which being sustained and plaintiff having declined to plead further a judgment against him was duly entered reading: "IT IS, THEREFORE, HEREBY ORDERED, ADJUDGED AND DECREED by the Court that the Plaintiff take nothing by his Petition filed herein, that said Petition be, and the same is, hereby dismissed, and that the Plaintiff pay the costs incurred herein, to which Judgment the Plaintiff excepts, which exception is hereby allowed."

The sole question involved here is whether an unemancipated minor son by his natural mother as next friend may sue and obtain a judgment against his natural father, the action being based on simple negligence only.

11 Am. Jur. p. 490, § 182, states that:
"Where an action is brought in one jurisdiction for a tort committed in another, the general rule is that all matters relating to the right of action are governed by the lex loci delicti. That law determines whether a person has sustained a legal injury."

So in 15 C.J.S. p.897, § 12, it also says that:
"It is thoroughly established as a general rule that the lex loci delicti, or the law of the place where the tort or wrong has been committed, is the law that governs and is to be applied with respect to the substantive phases of torts or the actions therefor, and determines the question of whether or not an act or omission gives rise to a right of action or civil liability for tort, * * * "

Under this rule as announced by these texts which is supported by abundant undoubted authority we must determine, if we can, what the law of Montana is relative to the question we have now for decision, viz: whether an unemancipated minor child may sue a parent and obtain a judgment for alleged damages in a suit brought in this jurisdiction. Counsel for appellant herein assert that Montana law does not aid in the solution of the question. But it would appear that they have overlooked the full import of the decision of the Supreme Court of that state in Conley v. Conley, 92 Mont. 425, 15 P (2d) 922, and to which we referred in our case of McKinney v. McKinney, 59 Wyo. 204, 135 P. (2d) 940, where it appeared that the wife as plaintiff brought the action to recover damages from the defendant, her husband, for personal injuries alleged to have been caused by the negligence of the defendant

husband's chauffeur while she was riding, at the defendant's invitation, as a passenger in defendant's automobile. A demurrer to the plaintiff's complaint was sustained. Plaintiff declined to amend and judgment was passed against her. Affirming this judgment of the trial court by unanimous opinion, five judges sitting, the court held (Syllabus 7 of 15 P (2d) 922) :

"Where right sought to be asserted was unknown to common law it became part of state law, authority for such right must be found in legislative acts."
and in part said (at p. 925, 15 P. (2) ) :

"Where a right sought to be asserted was not known to the common law at the time it became a part of the jurisprudence of this state, *'authority for the right, if it exists, must be found in the acts of the Legislature.* Bannack Statutes, p. 356, sections 5672, 10703, R.C.M. 1921; Aetna Accident & Liability Co. v. Miller, 54 Mont. 377, L.R.A. 1918C, 954, 170 P. 760; Jonosky v. Northern Pac. Ry. Co., 57 Mont. 63, 187 P. 1014; State ex rel Metcalf v. District Court, 52 Mont. 46, Ann. Cases. 1918A, 985, L.R.A. 1916F, 132, 155 P. 278.' Simonsen v. Barth, 64 Mont. 95, 208 P. 938, 939." (Italics supplied.)

We understand that it is conceded by appellant that the right attempted to be enforced in the instant action "was not known to the common law at the time it became a part of the jurisprudence" of Montana and also that no act of the Montana Legislature has authorized such an action. We may also here remark that nothing has been drawn to our attention which would lead us to think that the alleged right sought to be enforced in the action at bar was allowable as known to the "common law at the time it became a part of the jurisprudence" of that state or that there was Montana statutory authority authorizing the enforcement of such an asserted right. It must follow, as it seems to us, if we properly understand the above quoted language in the Conley case that the action at bar cannot be maintained

in this jurisdiction. The tort occurred in Montana as plaintiff's initiatory pleading shows.

But if we are mistaken in the conclusion we have drawn in the last preceding paragraph still we are satisfied that under the overwhelming weight of authority a sound public policy forbids the maintenance of such an action in this state, see 19 A.L.R. (2d) p. 425, note 11 and p. 439, § 10.

There are some 26 or 27 jurisdictions in this country supporting this view and there are only some 8 or 9 jurisdictions which, under special circumstances, not appearing in the instant case, have held to the contrary.

The Boston University Law Review, Vol. 23, pp. 259, 260, commenting on the late case of Borst v. Borst, 41 Wash. (2d) 642, 251 P (2d) 149 (1952) says:

"A review of the authorities reveals that this case is contrary to the overwhelming weight of authority. However it is not without precedent nor without strong reasons supporting it. Beginning with the case of Hewlett v. George, the courts developed what seemed to be a rather settled general rule of absolute immunity, that an unemancipated minor child cannot maintain a tort action against his parent. The wide acceptance of this rule is chiefly due to the following reasons advanced in its behalf:

"1. Preservation of family harmony.

"2. Maintenance of disciplinary authority of the parent.

"3. Prevention of collusion or fraud.

"4. Preservation of equal distribution of the family exchequer.

"5. Avoidance of useless litigations, since the parent may inherit any money which the child recovers in such an action.

"6. Prevention of stale claims by minors upon reaching majority.

"So long as these reasons prevail the courts are justified in adhering to the rule."

The Mississippi case of Hewlett (Hewellette) v. George, 68 Miss. 703, 711, 9 So. 885, 13 L.R.A. 682 decided in 1891 started the strong current of authority which has been so positively established in this country as stated above and its ruling was based upon an assertion that:

"The peace of society, and of the families composing society, and a sound public policy, designed to subserve the repose of families and the best interests of society, forbid to the minor child a right to appear in court in the assertion of a claim to civil redress for personal injuries suffered at the hands of the parent.

"The state, through its criminal laws, will give the minor child protection from parental violence and wrongdoing, and this is all the child can be heard to demand."

So Professor Jaggard in his Hornbook work on Torts says at p. 462:

"So long as the parent is under obligation to care for, guide and control, and the child is under reciprocal obligation to aid, comfort, and obey, it would seem that no action for tort will lie on behalf of such child against a parent."

We note that respondent states in his brief that Missouri should be classed with those jurisdictions which sustain the minority view under special circumstances relative to the legal question here involved. He refers to the case of Wells v. Wells (Mo. App.) 48 S.W. (2d) 109. The case of Cook v. Cook, 232 Mo. App. 994, 124 S.W. (2d) 675, 676, 677, seems to have been overlooked. In that case it was held in Syllabus 4 that an:

"Unemancipated minor child has no right of action against parent or person standing in loco parentis for tort of such parent or person, unless right of action is authorized by statute."

The Missouri Appeals Court quotes from the New Jersey case of Mannion v. Mannion, 129 A. 431, 3 N.J. Miscl. 68, 42 A.L.R. 1363, where the court said:

"In any event, the great weight of authority unquestionably sustains the proposition that a minor child cannot sue one of his parents, at least during minority, for the negligent act of such parent from which the child suffers injury to his person. This rule is undoubtedly founded upon a sound public policy, and is based upon the interest that society has in preserving harmony in the domestic relations, an interest which has been manifested since the earliest organization of civil government, an interest inspired by the universally recognized fact that the maintenance of harmonious and proper family relations is conducive to good citizenship, and therefore works to the welfare of the state."

The Missouri Court before making the quotation above set forth states:

"We do not find from any of the cases cited sufficient authority to justify us in holding that in Missouri a minor child has a right to sue its parents for damages sounding in tort. It is our conclusion that the trial court erred in refusing to sustain the demurrer when so requested in this case. We shall give briefly our reasons for such a conclusion. There is no statutory provision for such a suit in this state. * * * In 46 C.J. at page 1324, we find this language: 'An unemancipated minor child has no right of action against a parent or a person standing in loco parentis for the tort of such parent or person unless a right of action is authorized by statute.' "

The latest case dealing with the question now before us so far as our research has disclosed is that of Baker v. Baker, Missouri, 263 S.W. (2d) 29, decided December 14, 1953. That was a suit by a minor through her mother as next friend against her father, George Baker, to recover $15,000 damages for personal injuries alleged to have been sustained while her father, in backing his car out of the driveway at home, negligently

backed the car into and upon his child. It was alleged in the petition that the defendant was fully insured with a named insurance company for any liability and any judgment against the defendant would have to be paid by the insurer. The defendant filed a motion to dismiss the petition on the ground that it failed to state a claim on which relief could be granted. The trial court sustained this motion and plaintiff appealed.

The Supreme Court of Missouri stated the basic question as follows:

" * * * whether an unemancipated child may maintain an action in tort against its parents."

The court then said:

"The general rule, without doubt, is that such a child may not sue the parent in tort. 67 C.J.S., Parent and Child, § 61 (2), page 787; 39 Am. Jur. 735, Sec. 90; 20 R.C.L. 631."

The Cook case, supra, was thereafter reviewed and the Luster case, infra, was also cited with other cases. The court further said at p. 32 of 263 S.W. (2d):

"In no case cited and reviewed has a court held that an unemancipated minor child may recover in a tort action against its parents where the action is based on mere negligence. In each case where a suit by a child against a parent was maintained, the court found some reason to make an exception. For example, the situations presented wilful, malicious conduct, master and servant relationship, or parent engaged in business venture. We, by this opinion, do not intend to approve or disapprove any of the particular cases referred to in this opinion. What we do hold is that plaintiff's suit in this case cannot be maintained for the reason that to do so would be against public policy. Such a ruling is supported by all of the authorities above cited.

"The second question presented is, does the fact that the defendant was insured make any difference? We rule that it does not. There are cases which hold that

insurance does remove the immunity. For cases so holding, see 67 C.J.S., Parent and Child, § 61, page 789. Many other cases rule that nonliability is not affected by insurance. See Lund v. Olson, 183 Minn. 515, 237 N.W. 188; Elias v. Collins, supra; Segall v. Ohio Casualty Co., 224 Wis. 379, 272 N.W. 665, 110 A.L.R. 82."

The appellant appears to rely strongly upon the recent case of Borst v. Borst, supra, cited by appellant in "an additional authority" memorandum filed after the argument in the case at bar had been concluded, and where the Borst case was discussed by counsel generally. That was a case where an unemancipated minor child brought suit against his father for personal injuries sustained when the father operating his business vehicle for business purposes ran over the plaintiff who was playing in the street. The trial court sustained a demurrer to the complaint and entered a judgment of dismissal. On appeal this judgment was reversed, the court holding that the complaint stated a cause of action since the defendant was engaged in his business at the time of the accident and consequently the rule granting immunity to parents from suit brought by children against them for torts committed in the discharge of parental duties was inapplicable.

It is noteworthy that in the Borst case the Washington court significantly pointed out that (251 P. (2d) 149 ,152;

"The courts are in apparent agreement that where the child, while riding in the family automobile, is injured as a result of negligence on the part of the parent driver, no cause of action against the parent may be maintained." (Citing many cases).

The appellant's brief also urges upon us as in point the case of Signs v. Signs, 156 Ohio St. 566, 103 N.E. (2d) 743, decided 1952. In that case facts appear which clearly distinguish it from the case at bar. In

the Signs case a minor child, the plaintiff, was burned by a fire breaking out near a gasoline pump which was owned and operated by a partnership composed of the child's father, Leo Signs, and one Walter Krupp, doing business as Signs & Krupp. The action was instituted by Madeline Signs, as next friend for Thomas Signs, the son of Madeline and Leo Signs.

The Supreme Court affirmed the judgment of the Ohio Court of Appeals, which had reversed the Court of Common Pleas of Huron County, which last mentioned court had given a judgment on the pleadings of the defendant, Leo, On appeal from the Court of Appeals ruling, before the Supreme Court of Ohio it was urged simply, that the question for decision was, as the opinion states, whether an unemancipated minor child had the right to maintain an action in tort against his father in his business or vocational capacity, citing Worrell d.b.a Blue Ridge Bus Line v. Worrell, (1939), 174 Va. 11,4S.E. (2d) 343, and other cases, the court held as its syllabus states, that:

"A parent in his business or vocational capacity is not immune from a personal-tort action by his unemancipated minor child."

No such facts appear in the case at bar, as we have seen. In the course of its opinion on the Signs case, the court said at p. 747:

"We are not in accord with the reasoning of some of the courts that the presence or absence of liability insurance should make a difference in respect to liability, as we are of the opinion that the problem presented to us should be solved irrespective of the question of such insurance since it does not have any effect upon the merits of a tort controversy between any parties."

In the recent case of Brumfield v. Brumfield, 194 Va. 577, 74 S.E. (2d) 170 (Jan 26, 1953,) the Supreme Court of Appeals of Virginia said: (p. 174) :

"The plaintiff not having been emancipated, her position is that of an infant child suing her father because of his negligence. She is precluded from maintaining the action under the law of this State, as applied in the case of Norfolk Southern R.Co.v. Gretakis, 162, Va. 597, 174 S.E. 841. In that case the plaintiff was denied the right to compel contribution by a father whose negligence had concurred with that of the plaintiff in causing injury to his infant daughter because, it was held, the infant had no right of action against her father. It was there said: 'According to the great weight of authority an unemancipated minor child cannot sue his or her parent to recover for personal injuries resulting from an ordinary act of negligence.' 162 Va. at page 600, 174 S.E. at page 842. The reasons for that rule have been frequently stated and need not be now repeated. Those given in Cannon v. Cannon, 287 N.Y. 425, 40 N.E. (2d) 236, well apply to the facts here."

The court then proceeded to distinguish the Worrell case, supra, and thereupon remarked:

"No such exception exists here to prevent the application of the general rule. It was specifically held in the Gretakis case and repeated in the Worrell case that the fact that the father carried liability insurance created no liability or cause of action where none otherwise existed. So it is generally held. Annotation 19 A.L.R. 2d at page 435.

"Neither is an exception to be made because gross negligence is here alleged against the father. It was treated as having been alleged in the Gretakis case and found to exist in the Worrell case."

In elaborating the doctrine of sound public policy which the Mississippi Court invoked it may not be a disservice to refer to the decisions of some of the appellate courts of the union which have felt and yielded to the pressure of the prevailing current of authority.

In the case of Mildred Small by her next friend v. John R. Morrison, The Globe Indemnity Company and

J. C. Small, 185 N.C. 577, 584, 585, 586, 118 S.E. 12, 31 A.L.R. 1135, which was a civil action on behalf of the infant plaintiff brought by her next friend to recover damages of the infant's father, J. C. Small, and the other defendants named for an alleged negligent injury caused by the collision of two automobiles, one driven by the plaintiff's father and the other driven by Morrison, both Small and the Globe Indemnity Company demurred to the complaint. These demurrers were sustained and plaintiff appealed. The court upheld the ruling on the demurrers below and in part stated:

"The argument in favor of sustaining a recovery in cases like the present seems to be that, on principle, there is no reason why the parent should not be subject to a civil responsibility similar to that of a guardian or teacher, who, though standing *in loco parentis,* is liable for excessive punishment. Cooley on Torts (2 ed.) 198. We think this argument, however, is more than overcome by practical considerations of public policy, which discourage causes of actions that tend to destroy parental authority and to undermine the security of the home. No greater disservice could be rendered to any child than to teach its feet to stray from the path of rectitude, or to suffer its mind to be poisoned by ideas of disloyalty and dishonor. The policy heretofore established in this State with respect to the maintenance of the family as the social unit is diametrically opposed to the communistic theory which Russia has unsuccessfully sought to put into practice. From the very beginning the family in its integrity has been the foundation of American institutions and we are not now disposed to depart from this basic principle. Freedom in this country is the self-enforcement of self-enacted laws; and liberty with us is the right to go and do as you please under the law, or so long as you please to do right. Hence, in a democracy or a polity like ours, the government of a well ordered home is one of the surest bulwarks against the forces that make for social disorder and civic decay. It is the very cradle of civilization, with the future welfare of the commonwealth dependent, in a large measure, upon the efficacy and success of its administration. Under these condi-

tions, the State will not and should not permit the managment of the home to be destroyed by the individual members thereof, unless and until the interests of society itself are threatened. Whenever this occurs, adequate provision for the protection of the community, as well as the members of the family involved, has been supplied in the form of juvenile courts, welfare officers, etc. To say that a minor child, while living in the household of its parents, must be given the right to sue the latter for a tort committed, or else be declared an 'outlaw' is simply begging the question and overlooking entirely the consequences that such a proceeding would have upon the household of which said child is an important member and component part. In this society of ours, complex as it is, all rights are relative and the courts, as well as the legislature must look to the larger good and not merely to the smaller hope. They are not to be 'penny wise and pound foolish.' It is conceded that the case at bar must be decided on general principles, as there is no enactment of the General Assembly covering the subject; and it is further conceded that we have not yet adopted the destructive theory of communism as a governmental policy in this country.

\* \* \* \*

"There are some things that are worth more than money. One of these is the peace of the fireside and the contentment of the home; for of such is the kingdom of righteousness. While the family relation of parent and child exists, with its reciprocal rights and obligations, the latter should not be taught 'to bite the hand that feeds it', and no such action as the present should be entertained by the courts. As the twig is bent, the tree will incline; and it is the inexorable law of nature that whatsoever a man soweth, that shall he also reap. Grapes are not gathered from the thornbush, nor figs from the thistle. It is doubtful if any age promises a sweeter remembrance than that of a happy childhood, spent in the lovelight of kindly smiles and in the radiance of parental devotion. 'Honor thy father and thy mother that thy days may be long upon the land which the Lord thy God giveth thee' is an injunction from on high, and it contains as much truth today as it did under the Mosaic dispensation. Verily,

it is a command of Holy Writ—good for all time. In youth the currents of life are prodigal in their racing course, and we should be slow to encourage or to permit a minor, in the household of its parents, unemancipated, and who has not yet arrived at the age of discretion, acting only upon the advice of a 'next friend,' to run the risk of losing a priceless birthright and a rich inheritance in an effort to gain for the moment a mere mess of pottage, or a few pieces of silver. If this restraining doctrine were not announced by any of the writers of the common law, because no such case was ever brought before the courts of England, it was unmistakably and indelibly carved upon the tablets of Mount Sinai.

"Of course, nothing we have said in this opinion is to be understood as withdrawing in the least from a minor child its right of protection against a cruel and unkind parent. Should the occasion arise, or whenever necessary, the State will provide for its care and custody, because it is interested in its welfare; and, if need be, an offending parent will be visited with the pains and penalties of the criminal law."

Clark, C. J. delivered an elaborate dissenting opinion.

Wick v. Wick, 192 Wisconsin 260, 212 N.W. 787, 788, was an action brought against the defendant by his child, Laurenta Wick, an infant less than 14 years old by her mother, Alvina Wick, as the child's guardian ad litem. The action was to recover damages for person injuries sustained by plaintiff as a result of an automobile accident claimed to be due to the negligence of the defendant. A demurrer to the complaint was overruled. From that order the defendant appealed and the question was presented whether an infant child may maintain an action in tort against its parents. Reversing the action of the trial court the cause was remanded with instructions to sustain the demurrer. After indicating the existence of the great weight of

authority against the allowance of such an action the court in the course of its opinion said:

"The reasons in support of this doctrine may be summarized as follows: The family is a social unit. The members thereof are of the same blood. They are bound together by the strongest natural ties. Naturally, mutual love and affection obtain between the members thereof. There is mutual interest in one another's welfare. The family fireside is a place of repose and happiness. Society takes its caste from the character of its homes. It has a deep interest in maintaining in its integrity and stability the natural conception of the family unit. This imputes authority to the parent and requires obedience of the child. To question the authority of the parent or to encourage the disobedience of the child is to impair the peace and happiness of the family and undermine the wholesome influence of the home. To permit a child to maintain an action in tort against the parent is to introduce discord and contention where the laws of nature have established peace and obedience. Natural instinct condemns such proceedings as mostly unseemly, and the laws of society will not, to the detriment of society, defeat the benign influence of the laws of nature. That public policy which looks to the public welfare will not encourage discord and rebellion in the family unit, and thus destroy that wholesome influence of the home in moulding the character of our future citizens. Generally speaking, filial affection is ample protection to the child from excessive punishment at the hands of the parent, but where the authority of the parent is abused in the way of excessive or brutal punishment a child will be protected through the criminal laws of the state. True, this does not redress the child for permanent injuries which thus may be inflicted. But it is deemed better public policy that occasional injuries of this kind go unrequited rather than encourage or tolerate proceedings so repugnant to natural sentiments concerning family relations. We find ourselves thoroughly in accord with courts holding that an action of this kind cannot be maintained, and indorse the doctrine as one founded in a wholesome public policy."

One of the judges registered his dissent from the views of the majority.

The case of Cowgill v. Book, 189 Ore. 282, 218 P (2d) 445, 451, 452, cited by appellant does not aid us much in reaching a correct disposition of the instant case. This is demonstrated by the following excerpt from the opinion of the majority of the court, viz:

"We appreciate full well that it is a wholesome rule and that it should be the policy of the law to preserve and maintain the security, peace and tranquility of the home, which indeed is the very foundation upon which our government rests. It is unthinkable, that a parent, while acting within the scope of domestic relations, should be brought into court to defend against every unintentional personal tort that might be committed against a minor child. It is common knowledge that a parent, in order to maintain discipline and the quiet and peace of the home, is in the ordinary course of human events, occasionally obliged to administer reasonably corporal punishment to a minor child. However, if from wicked motives a parent should brutally beat his minor child and thus maim him for life, are we to say that he should be immune from liability merely by reason of his parenthood? Is the welfare of society or a wholesome public policy subserved by granting immunity to a parent guilty of such brutality? * * *

"After a careful consideration of the authorities, we think the general rule — so well established by the authorities—should be modified to allow an unemancipated minor child to maintain an action for damages against his parent for a wilful or malicious personal tort. The evidence in the instant action certainly shows that the decedent—father was guilty of wilful misconduct. Ordinary negligence or the doing of an unintentional wrong cannot be the basis for such an action. To apply a hard and fast rule of nonliability to the facts in this case would, in our opinion, defeat justice and not subserve a sound public policy."

We may appropriately note also the pertinent excerpt from the dissenting opinion of Mr. Justice Brand at page 457 to the following effect:

"Nor is the disruption of the spirtual harmony of the family the only basis for the policy which denies recovery in these cases. Recovery by an infant suing by guardian against his father might in many instances result in the transfer to the infant of the family assets on which other innocent children, members of the same family, are dependent for support. It must be remembered that the law as well as parental affection imposes upon a father the duty of care for an injured child whether the injury was the result of a tortious act or of pure accident. 39 Am. Jur. Parent and Child, § 47, p. 672."

In Matarese v. Matarese, 47 R.I. 131, 131 A. 199, 42 A.L.R. 1360, the action was one where the defendant was the father of the plaintiff. The evidence presented in the case established that the defendant bore that relation to the plaintiff and that:

"At the time of the injury complained of the plaintiff was about five years old, and was a member of her father's household. Just before her injury she was playing on the sidewalk near her home and the defendant was approaching her driving an automobile. The defendant, at the request of the plaintiff, stopped, and then either invited or permitted the plaintiff, to sit upon the running board of the machine to ride to their home. While she was in that position the defendant started the machine forward, the plaintiff was thrown to the ground, a rear wheel of the automobile passed over her leg, fracturing the bone and seriously injuring her. The justice directed a verdict for the defendant on the ground that the plaintiff could not maintain an action of this nature against her father."

Affirming the ruling of the trial court in holding the litigation not maintainable and directing a verdict for the defendant the appellate court declared:

"Immemorially the family has been an important element of our civil society, one of the supports upon which our civilization has developed. Save as modified by the Legislature, in domestic affairs the family has remained in law a self-governing entity, under the discipline and direction of the father as its head. As

part of the family order or arrangement are the related obligations and rights of the father and his minor child while the child remains in his household unemancipated. On the part of the father is the right and duty to control, protect, support, and to guide or educate the child. The reciprocal duty of the child is to serve and obey the father. These fundamental principles are traceable to ancient customs and usages, and are fixed by tradition and evidenced by the decisions of the courts. Anything that brings the child into conflict with the father or diminishes the father's authority or hampers him in its exercise is repugnant to the family establishment, and is not to be countenanced save upon positive provisions of the statute law. Any proceeding tending to bring discord into the family and disorganize its government may well be regarded as contrary to the common law, and not to be sanctioned by the courts. Such conflict would arise by recognizing the right of a minor child to bring his personal action against the father to recover damages for torts alleged to have been committed by the father in the course of the family relation, and resulting in personal injury to the child. The state by criminal proceedings will punish the father for the gross abuse of his power of control and discipline resulting in injury. For his continued abuse or neglect, indicating that the restraint arising from parental affection has failed, the state will remove the child from the father's control. It is, however, inconsistent with the family relation, while it exists, to permit the maintenance of such an action as that at bar of a minor child against his father to recover damages for the alleged negligence of the father."

Of similar purport is the case of Rambo v. Rambo, 195 Ark. 832, 114 S.W. (2d) 468. In that case the defending father carried a public liability policy.

In Luster v. Luster, 299 Mass 480, 13 N.E. (2d) 438, 439, 440, Mr. Justice Qua declared in part, as he spoke for the court, in a case where the court was considering an action brought by an unemancipated minor child against his father, and it appeared that the defendant

had negligently backed his truck over his minor son causing the latter severe injuries:

"But beginning in 1891 and continuing to the present an overwhelming weight of authority has been built up in this country against the maintenance of such actions on grounds of public policy. It is also generally held that similar actions will not lie by a parent against his minor child. * * * *

"Although the relation of husband and wife at common law does not furnish a perfect analogy to that of parent and minor child, yet it seems significant that notwithstanding the statutes which have been passed to enable the two spouses to stand before the law as separate individuals with substantially equal rights, our Legislature still refuses to authorize actions at law between them. G. L. (Ter. Ed.) c. 209, § 6; Lubowitz v. Taines, Mass. 198 N.E. 320. The reason for this would seem to lie in views of public policy which are equally applicable as between parent and minor child. See Thompson v. Thompson, 218 U.S. 611, 617, 31 S. Ct. 111, 54 L.Ed 1180, 30 L.R.A.(N.S.) 1153, 21 Anno. Cas. 921.

"We are aware that the majority rule has been criticized by some commentators; that text writers are not all in agreement upon it; that it has been doubted and distinguished by a majority of the court in the recent thoroughly considered case of Dunlap v. Dunlap, 84 N.H. 352, 150 A. 905, 71 A.L.R. 1055;; and that in several of the leading cases there are vigorous dissents. Nevertheless we believe that, as applied to a case like this, the principle of the American decisions is sound.

"We cannot follow the plaintiff's contention that this case is taken out of the general rule because, as it is said, the circumstances of the accident were not connected with the father's duty to rear his child or with the conduct of domestic establishment and were such that any other child in the plaintiff's position would have been injured. We do not perceive how it would be possible in practice to draw such a line of distinction as that here suggested. The objections based upon public policy reach to and include this case.

"It is difficult to see how the fact, if it be a fact, that the defendant carried liability insurance covering this accident can impose a liability where none would otherwise exist. Aside from a certain incongruity in attemptng to bend general rules of liability so that their application to particular instances shall depend upon the existence or absence of insurance against such liability, it would seem that insurance does not remove the fundamental objections to such an action as this. The proceeding is still in theory an adversary one, and for various reasons it may be such in fact. If it is not, then it becomes peculiarly liable to abuse through collusion. Other courts have said that the fact that the defendant parent is insured does not change the rule." (Citing many authorities.)

About two years later the same court had occasion to decide the case presenting in its facts substantially the converse of the Loster case. In Oliveria v. Oliveria 305 Mass. 297, 25 N.E. (2d) 766, 767, with the Luster case, supra, before him, the same judge then remarked, as he spoke for the court, very pertinently that:

"The first case presents the question whether a parent may maintain an action against his or her unemancipated minor child, who is living in his or her family, for personal injuries caused by negligence. In Luster v. Luster, Mass, 13 N.E. 2d 438, we held that under similar circumstances public policy prevented recovery by the child against the parent. Not all of the particular reasons given for our former opinion apply conversely to the case now before us. But in our view the fundamental objection that it is contrary to the best interests of society that the innumerable intimate contacts between parent and child in the life of the family should become the subject of actions for negligence remains in full force. Desirable as it is that the law should develop logically and symmetrically, it is still more important that it should be suited to the manner of life and habits of thought of the great mass of people whom it is to govern. In our opinion it is repugnant to the prevailing sense of propriety that a mother should bring an action at law against her own minor child, perhaps of tender years, for some

act of carelessness in the course of family life which it might seem that the child had the capacity to foresee and to prevent. As the law must operate through general rules, and as twenty-one years is the established age at which parental authority and the common law duties of support and obedience cease, we can find no sufficient reason for introducing difficult distinctions based upon the age of the minor. Such an action as this was unknown here until the recent extension of liability insurance held out the hope that occurrences within the home cirle might become a source of net profit to the family. The great weight of existing authority, most of which is found in very recent cases, is against such an action." (Citing many cases.)

One of the latest cases which has come under our notice relative to the question we have before us is that of Adam v. Nadel 124 N.Y.S. (2d) 427 (decided August 20, 1953, by the Supreme Court at Special Term). That was a case where an infant ward of an orphan asylum was injured as the result of an automobile accident which occurred while the infant was a passenger in the automobile. The court held that the infant was entitled to maintain an action for the injuries against the driver of such automobile although the infant had been *adopted* by the driver. Pointing out that an action for personal injuries resulting from negligence could not be maintained in New York against a natural parent by an unemancipated child, the court reviewed the controlling decisions of the New York Court of Appeals and expressed its complete agreement with those cases. The language used by the court in its opinion relative to this point is as follows (p. 429) :

"In Cannon v. Cannon, 287 N.Y. 425, 40 N.E. 2d 236, 237, the Court of Appeals had before it the specific question 'May an unemancipated minor child maintain an action against his parents for personal injuries alleged to have been caused by their negligence?'

"The court's answer was in part as follows, 287 N.Y. at pages 428, 429, 40 N.E. (2d) at page 238:

" 'Not yet, however, have our courts granted an un emancipated child—whom the law decrees to be a member of that household—the right to hold his parents in damages for unintended personal injuries resulting from such conditions. Indeed, if within the wide scope of daily experience common to the upbringing of a child a parent may be subjected to a suit for damages for each failure to exercise care commensurate with the risk—for each injury caused by inattention, unwise choice or even selfishness—a new and heavy burden will be added to parenthood.' * * *

" 'In the absence of statutory sanction, we are not prepared, in cases where wilful misconduct by the parent is not a factor, to inject the disruptive risk of tort liability between parents and their unemancipated children, in which relationship both parents and children—by nature and by law—have reciprocal duties to perform which still make for family unity.'

"The rationale for this rule was also set forth in Crosby v. Crosby, 230 App. Div. 651, at pages 652-653, 246 N.Y.S. 384, at page 386, as follows:

" 'Among the reasons assigned by the courts for denying an unemancipated child, the right to recover for a personal injury inflicted by the parent is the danger of disrupting the tranquility of the family, the interference with parental discipline and control, and the old Roman doctrine that the family in its entirety was a unit * * * . "Public policy is said to favor this rule of statutory construction as safeguarding the home. 'It is better to draw the curtain, shut out the public gaze, and leave the parties to forget and forgive.' "

It may not be amiss to add at this point a brief excerpt from Mr. Ernest R. Groves' treatise on "The Family and its Social Functions." The learned author there said at p. 218:

"The modern state maintains a twofold relationship with the family. It gains support from and gives support to the domestic institution. *Family deterioration*

*registers quickly in political life, appearing in loss of integrity in both citizenship and governmental activities."* (Italics supplied).

So we reiterate after an examination and study of the above cited authorities and very many more that a sound public policy leads us to think that the trial judge in the case at bar was correct in his rulings and we are, therefore, constrained to sustain his ruling on the demurrer and subsequent judgment.

It will be understood nevertheless that we confine the result reached in this case to the situation disclosed herein. Naturally, we do not undertake to determine any rule for causes involving special circumstances widely variant from those now presented at bar.

However, we feel that it is proper to say also as did the Rhode Island Court in the Matarese case, supra, in substance, that the judiciary should be reluctant to encourage actions as maintainable between children and their parents unless sanctioned by the statute law or where they disclose so clear an invasion of the rights of the child as tending to bring discord into the family and to disorganize its proper government. Let the judgment of the District Court of Sheridan county be affirmed.

*Affirmed.*

HARNSBERGER, J., AND KLINE, D. J. concur