## Parks, Appellant, *v.* Parks.

288

Argued May 27, 1957.　Before Jones, C. J., Bell, Chidsey, Musmanno, Arnold, Jones and Cohen, JJ.

*Robert Siegel* and *John Idomir*, with them *Harry L. Siegel* and *Siegel & Siegel*, for appellants.

*Thomas D. Caldwell*, with him *Carl B. Stoner*, *Albert Houck* and *Caldwell, Fox & Stoner*, for appellee.

Opinion by Mr. Justice Benjamin R. Jones, October 7, 1957:

The principal question raised upon these appeals is whether an unemancipated minor child[1] can maintain an action against her parent to recover damages for negligence arising from the parent's operation of a motor vehicle.

Karen Ann Parks, then a child less than six months of age, on June 5, 1952 was a guest passenger in an automobile owned by her father, Luther F. Parks, and

---

[1] An emancipated minor child—that is, a minor child released from legal subjection to his parents (*Detwiler et al. v. Detwiler*, 162 Pa. Superior Ct. 383, 386, 57 A. 2d 426)—is under no disability to maintain a tort action against his parents: *Dunlap v. Dunlap*, 84 N. H. 352, 150 A. 905; *Wood v. Wood*, 135 Conn. 280, 63 A. 2d 586; *Martens v. Martens*, 11 N. J. Misc. 705, 167 A. 227; *Brumfield v. Brumfield*, 194 Va. 577, 74 S.E. 2d 170; *Murphy v. Murphy*, 206 Misc. 228, 133 N. Y. S. 2d 796; *Martinez v. Southern Pacific Co.*, 45 Cal. 2d 244, 288 P. 2d 868.

operated by her mother, Helen Parks. An accident occurred[2] as the result of which the minor child allegedly received injuries resulting in total and permanent physical and mental disability and requiring that she be placed in a state institution.

A complaint in trespass, containing two counts, was filed: In the first count, the minor child's father, as guardian of the child and on her behalf, claimed compensation for pain and suffering, mental and physical disabilities and loss of future expectable earnings; in the second count, the father, in his own right, claimed compensation for past, present and future medical, hospital, surgical and other expenses and for loss of the child's earnings during her minority. The trespass action was instituted against the mother of the child.

Helen Parks (actually an insurance carrier)[3] filed preliminary objections asking judgment in her favor on the grounds that an unemancipated child could not maintain a tort action against her parent and that a husband could not maintain a suit against his wife. The Honorable JOHN J. PENTZ, specially presiding, sustained the preliminary objections and from his orders appeals were taken. After the appeals had been filed, it appearing that the orders appealed from were not final orders, a petition to remand the record was filed so that judgments could be entered in accordance with

---

[2] According to the averments in the Complaint, the automobile being operated by Helen Parks in a southwesterly direction on Route 44018, at a point in the vicinity of the American Legion Country Club in Wayne Township, Mifflin County, left the highway and struck a tree located two and one half feet from the northeastern berm of the highway. The acts of negligence alleged were (1) excessive speed, (2) failure to have the car under control and (3) failure to observe the highway ahead.

[3] The insurance policy was issued to the father as owner of the automobile, but covered the mother's operation of the automobile.

the orders of the court below. The record was remanded, judgments were entered and these two appeals ensued.

During the pendency of the proceedings in the court below, Luther F. Parks filed an affidavit setting forth that he carried insurance with the State Automobile Insurance Association of Indianapolis, Indiana, covering liability for bodily injuries in the amount of $10,000 for each person and $20,000 for each accident arising from the operation of his automobile; that this insurance covered Helen Parks in her operation of the automobile; that, as guardian and as father, he agreed to limit the amount of any recovery from the trespass action to $10,000, the face amount of the policy.

Appellant's argument is four-fold: (1) that an unemancipated child should be permitted to maintain a tort action for damages sustained as the result of parental negligence where the damages have been sustained under circumstances not arising from the exercise of parental discipline and control or in the conduct of the domestic establishment; (2) since the minor child in this situation is confined in a state institution where, in all likelihood, it will remain for the balance of its life, the family relationship is dissolved and, therefore, the public policy fostering the maintenance of family unity is inapplicable to bar this action; (3) if it has been the policy of the law in Pennsylvania to forbid a tort action between a child and parent such policy has been changed by several Acts of the General Assembly requiring all operators of motor vehicles to maintain public liability insurance so as to provide protection to all persons injured by the operation of such vehicles; (4) a rule of law forbidding a tort action by an unemancipated minor child against its parent should not apply where liability insurance covers the negligent acts of the parent.

There was no common law rule that a child could not sue its parent: *Briggs et al. v. City of Philadelphia et al.,* 112 Pa. Superior Ct. 50, 55, 170 A. 871; *Dunlap v. Dunlap,* supra. The rule that a child cannot sue its parent has arisen within the past six decades.[4] The vast majority of courts in the United States deny any right to an unemancipated child to maintain a tort action against its parent: Alabama (*Owens v. Auto Mutual Indemnity Co.,* 235 Ala. 9, 177 So. 133); Arkansas (*Rambo v. Rambo,* 195 Ark. 832, 114 S.W. 2d 468); California (*Perkins v. Robertson,* 140 Cal. App. 2d 536, 295 P. 2d 972); Connecticut (*Shea v. Pettee,* 19 Conn. Supp. 125, 110 A. 2d 492); Delaware (*Strahorn v. Sears, Roebuck & Co.,* 123 A. 2d 107); Georgia (*Wright v. Wright,* 85 Ga. App. 721, 70 S.E. 2d 152); Illinois (*Meece v. Holland Furnace Co.,* 269 Ill. App. 164); Kentucky (*Harralson v. Thomas, Admr.,* 269 S.W. 2d 276); Maine (*Skillin v. Skillin,* 130 Me. 223, 154 A. 570); Maryland (*Zaccari v. U. S.,* 130 F. Supp. 50); Massachusetts (*Luster v. Luster,* 299 Mass. 480, 13 N.E. 2d 438); Michigan (*Elias v. Collins,* 237 Mich. 175, 211 N.W. 88); Minnesota (*London Guarantee and Accident Company v. Smith,* 242 Minn. 211, 64 N.W. 2d 781); Mississippi (*Durham v. Durham,* 85 So. 2d 807); Missouri (*Baker v. Baker,* 364 Mo. 453, 263 S.W. 2d 29); Montana (*Ball v. Ball,* 73 Wyo. 29, 269 P. 2d 302); New Hampshire (*Levesque v. Levesque,* 99 N. H. 147, 106 A. 2d 563); New Jersey (*Reingold v. Reingold,* 115 N. J. L. 532, 181 A. 153); New York (*Epstein v. Epstein,* 283 App. Div. 855, 129 N. Y. S. 2d 54); North Carolina (*Lewis v. Farm Bureau Mut. Auto Ins. Co.,*

---

[4] "All the authorities are modern. What may be termed the earlier ones, those prior to 1891, are meager, conflicting and obscure": McCurdy, "Torts Between Persons In Domestic Relation", 43 Harv. L. Rev., p. 1059.

243 N. C. 55, 89 S.E. 2d 788); Ohio (*Krohngold v. Krohngold,* 37 O. L. R. 86, 181 N.E. 910); Oregon (*Cowgill v. Boock,* 189 Or. 282, 218 P. 2d 445); Rhode Island (*Matarese v. Matarese,* 47 R. I. 131, 131 A. 198); South Carolina (*Kelly v. Kelly,* 158 S. C. 517, 155 S.E. 888); Tennessee (*Graham v. Miller,* 182 Tenn. 434, 187 S.W. 2d 622); Texas (*Aboussie v. Aboussie,* 270 S.W. 2d 636); Virginia (*Brumfield v. Brumfield,* 194 Va. 577, 74 S.E. 2d 170); West Virginia (*Securo v. Securo,* 110 W. Va. 1, 156 S.E. 750); Wisconsin (*Cronin v. Cronin,* 244 Wis. 372, 12 N.W. 2d 677); Wyoming (*Ball v. Ball,* 73 Wyo. 29, 269 P. 2d 302). See also: 79 U. of Penn. L. Rev. 80-84; 9 Vand. L. Rev. 832-837 ("No case was found in which the court repudiated the rule of disability altogether and held that children could sue their parents for personal torts as they could strangers"); 19 ALR 2d 423-462.

In Pennsylvania our courts have had occasion to consider this question. The first case involving this question was *Briggs et al. v. City of Phila. et al.,* supra. A minor child was injured on a sidewalk in front of a property leased by her father and a trespass action was instituted by her father, on her behalf, and by her parents, in their own right, against the City of Philadelphia which, in turn, joined the father as an additional defendant. It was the City's contention that, since the minor child could not sue her father, and, since the City had the right of indemnity against the father as lessee of the premises upon which the accident occurred, the child could not maintain a suit against the City for that would permit the minor child to do indirectly that which she could not do directly. The Court, recognizing that the minor child "did not and could not obtain in this action a recovery against her father" (p. 55), allowed the minor child to maintain its suit against the City. In the course of its opin-

ion the Superior Court stated: "There never has been a common law rule that a child could not sue its parent. But, there is substantial decisional authority that it is not permitted, on the theory that it is disruptive of the family peace, destructive of the enforcement of discipline, and, therefore, against public policy. We recognize the wisdom of these rulings as the state and society are vitally interested in the integrity of, and harmony in, the family. . .".

In *Duffy v. Duffy,* 117 Pa. Superior Ct. 500, 178 A. 165, the converse of the present situation was considered: could an action for personal injuries resulting from negligence be maintained by a parent against an unemancipated child? The Court refused to permit the parent to maintain the action, assigning as its reasons therefor that the allowance of such an action would result in "discord in the home, disorganization of the family relation and the severing of the natural ties of affection" all of which the "state desires to prevent rather than promote" (p. 502).

In *Detwiler et al. v. Detwiler,* supra, the Superior Court considered whether a parent could maintain a suit against an unemancipated minor for injuries resulting from the minor's tortious conduct and the circumstances under which the minor could be considered emancipated. On the right of the parent to maintain suit the Court said (p. 385) : "It is settled beyond question in this State that parents cannot maintain a suit against an unemancipated minor son for injuries resulting from his tortious act. Both parents are barred on broad principles of public policy on the ground that such actions are disruptive of family peace and destructive of filial discipline. The soundness of the doctrine which jealously seeks to maintain peace, harmony and good will in the family relation can no longer be questioned. . . ."

The appellants urge that *Minkin (et al., Appellant) v. Minkin*, 336 Pa. 49, 7 A. 2d 461, supports their position. In that case an eight year old child brought suit against his mother to recover damages for the death of his father alleged to have resulted from the mother's negligent operation of an automobile. The court below, being of the opinion that public policy prohibited a suit by a minor against his mother and that the Death Statutes gave no right of action to the minor when one parent survived, entered a judgment for the defendant. This Court, by a 4-3 vote, reversed the court below. The majority of the Court were of the opinion that the Death Statutes, which allowed a minor to share in compensation payable by one whose negligence caused his parent's death, indicated a legislative intent in this type of action to displace the public policy which disallowed generally actions by a minor against a parent. It will be noted that the majority of the court limited its ruling to that type of actions wherein the Death Statutes apply. Mr. Justice (later Chief Justice) HORACE STERN, while concurring in the result, disagreed with the reasoning of the majority (p. 56) : "I am of opinion, however, that it is not against public policy for a minor to sue his parent, whatever the form of the action, where the suit is to vindicate *property* rights and not to recover damages for acts of violence or negligence affecting the person. For example, if a parent were to embezzle his child's money, or physically destroy his property, there is no reason why suit should not be permitted even though the action be in trespass. An action for damages resulting from a parent's death is to recover for a *property* loss—the deprivation of support that would have been received from the deceased had he lived."[5] The dissenting opinion takes

---

[5] "Since the minor may, through another, sue his parent to recover property rights, it is asked, are the property rights of a mi-

the position that the Death Statutes were passed ". . . not to overturn, but in subservience to the common law public policy . . ." and that only such statutory modification or change of public policy will be recognized as the statute clearly and definitely prescribes. Mr. Justice (later Chief Justice) SCHAFFER, speaking for the minority, said (p. 58) : "I would not make the departure from what I believe to be a most sound public policy leading to the maintenance of the family relation. I cannot seal with my approval that which I believe will have a tendency to disrupt it until the legislature, which declares the public policy of the State, shall overturn that which has existed time out of mind by giving to unemancipated minors the right to sue their parents for their alleged negligence".

An analysis of the *Minkin* decision indicates its purport is to allow a minor to sue its parent *only* where the right affected is a property right granted by the Death Statute and it does not sanction generally the maintenance of a tort action by an unemancipated minor child against its parent for damages for acts of negligence affecting the person. See also: *Silverstein v. Kastner et al.,* 342 Pa. 207, 20 A. 2d 205.

The lower courts in Pennsylvania have all disallowed the maintenance of this type of action: *York Trust Co., Guardian v. Blum, Administrator,* 22 D. & C. 313; *Morris et al. v. McKinley et al.,* 33 D. & C. 696; *Samborski v. Beck et al.,* 41 D. & C. 387; *Dunlevy v. The Butler County National Bank, Admr., et al.,* 64 D. & C. 535; *Frank et al. v. Lebow et al.,* 84 D. & C. 561; *Chesonis v. Chesonis,* 4 D. & C. 2d 449; *Brower et al. v. Webb, Admx.,* 5 D. & C. 2d 193.

---

nor of more importance to him than the rights of his person? No, but their protection will not disturb the family relation as will the action for personal injuries for every form of negligence as well as for batteries": *Mesite v. Kirchenstein,* 109 Conn. 77, 145 A. 753.

We have, however, recognized that the doctrine of intra-family immunity from suit by a member of the family expires upon the death of the person protected and does not extend to a decedent's estate for the reason that death terminates the family relationship and there is no longer a relationship in which the state or public policy has an interest. *Kaczorowski v. Kalkosinski, Admr.,* 321 Pa. 438, 184 A. 663; *Davis v. Smith,* 126 F. Supp. 497. Thus, although there may be immunity from suit between parent and child during life, the immunity does not extend to the personal representative of a deceased parent or child.

Furthermore, we have recognized the right of a minor child to maintain a tort action against a person who has the right of indemnity from or contribution from the child's parent in the event the child recovers damages in the action: *Briggs et al. v. City of Phila. et al.,* supra. Cf: *Koontz v. Messer and Quaker State Oil Refining Company,* 320 Pa. 487, 181 A. 792; *Fisher v. Diehl,* 156 Pa. Superior Ct. 476, 40 A. 2d 912.

The rule that an unemancipated child cannot maintain an action in tort for damages against its parent because of any negligent conduct on the part of the parent is sound. It is a rule based on the sound principle of public policy to promote family unity and avoid family discord and disturbance, it prevents possible collusive action between parent and child in situations where the liability of either parent or child is covered by insurance and it is in line with the great weight of judicial authority represented by practically every court of every state in this country.

Appellants next urge that, even if this rule be applied generally, yet this particular situation calls for a qualification of the rule because of the peculiar circumstances involved. The minor child, Karen Parks, is now in a state institution and, therefore, appellants

argue that there is not and cannot be any family relationship which would be disrupted by permitting this suit. Granted that the Complaint avers that "it will be necessary that KAREN ANN PARKS be maintained in an institution for the remainder of her life", that fact alone does not call for a relaxation of the rule. We know of no court which has ever recognized an exception to the rule based on such a fact. Appellants lose sight of the fact that there is always a possibility of a resumption of the family relationship. With death there comes an irreversible end and termination of the family relationship and such relationship lives only in memory; confinement in an institution may be only temporary and it lacks the finality of death in the severance of the family relationship. Family relationship is a two-way affair: parental devotion and care and affection may still flow toward the member of the family confined in the institution and this phase of family relationship may well be severed by litigation between the child and the parent. The grave possibility of collusive action between a representative of the child and the parent is not at all affected by confinement of the child in the institution. We can see no valid reason for a relaxation of the rule in this situation.

Appellants next submit that the rule is no longer sustainable because of certain Acts of the General Assembly requiring insurance coverage for the operation of motor vehicles and further because where there is liability insurance the reason for the rule ceases to exist.

The Motor Vehicle Safety Responsibility Act of June 1, 1945, P. L. 1340, as amended, 75 PS §1277.1 et seq., requires that all persons involved in any accident resulting in bodily injury or death or property damage in excess of $100 are required to file accident reports with the Secretary of Revenue; within sixty (60) days after receipt of a motor vehicle accident report, the

Secretary is required to suspend the license of each operator and all registrations of each owner of a motor vehicle in any manner involved in such accident unless the owner or operator deposits security in the amount determined by the Secretary to cover all claims which might be presented. This provision of the statute is inapplicable if the owner at the time of the accident had in effect an automobile liability policy with respect to the motor vehicle involved in such accident. Appellants argue that this Act is tantamount to a legislative declaration of public policy requiring all motor vehicle owners and operators to carry liability insurance and by this declaration of public policy changed the previous law (under the theory of the *Minkin* case, supra) so as to permit minor children to sue their parents. This argument loses sight of the rationale of the majority in the *Minkin* case, i.e. that by the Death Statutes the minor was expressly given a property right and therefore, impliedly at least, the minor could enforce that right even as against a parent, thus effecting a change in the previous law on the subject. The instant statute simply represents an attempt by the use of a sanction—to-wit, the suspense of the right to drive and registration of the vehicle—to secure for those injured in an action by an uninsured driver some redress *after* the happening of the accident. This statute does not require compulsory insurance on the part of the operator or owner of a motor vehicle; it is a legislative attempt to provide financial responsibility after an accident has happened so that the person injured may secure from a wrongdoer redress for his injuries. Appellants forget that even if the operator or owner, in compliance with the statute, posts security, it is still incumbent upon the person injured to establish that the operator or owner of the motor vehicle by which he was injured was liable for the happening of the accident

before the security can be utilized for the payment of the damages incurred. This statute deals with the *collectibility* of damages recovered, not with *liability* for the happening of the accident; it is still necessary to prove liability before redress can be had. It would be farfetched indeed to hold that by this statute the legislature intended any change in the rule of immunity from suit of a parent or a child.

Even though it be established—as in the instant case by appellants' affidavit—that the parent is covered by liability insurance, such fact should not require a relaxation of the rule. The fact that the particular parent who is the defendant is protected by insurance against legal liability should not enable the minor child to maintain the action if he could not otherwise have maintained it: *Lund v. Olson,* 183 Minn. 515, 237 N.W. 188; *Norfolk S. R. Co. v. Gretakis,* 162 Va. 597, 174 S.E. 841; *Bulloch v. Bulloch,* 45 Ga. App. 1, 163 S.E. 708; *Rambo v. Rambo,* supra; *Elias v. Collins,* supra; *Perkins v. Robertson,* supra; *Zaccari v. U. S.,* supra; *Levesque v. Levesque,* supra; *Signs v. Signs,* 156 Ohio St. 566, 103 N.E. 2d 743; *Brumfield v. Brumfield,* supra.

In *Duffy v. Duffy,* supra, the Superior Court refused to adopt an identical argument in the following language (p. 503) : "Without a legislative mandate, we see no justification for making such a discrimination, thus segregating automobile cases from other actions by a parent growing out of the negligent conduct of an unemancipated minor, because in many automobile cases insurance might be carried that would give protection. That distinction has never been recognized in any of the decisions called to our attention, and we refuse, as that court did, to adopt such a theory." In *Silverstein v. Kastner,* supra, this Court adopted the language in the *Duffy* case and stated (p. 208), "The

fact, therefore, that there was insurance in the instant case was of no moment".

The presence or absence of insurance should be of no importance in determining the general rule of immunity. The fact that a parent carries accident liability insurance does not create as against the parent any liability which would not exist were he insured. That a parent is covered by insurance is irrelevant since liability must exist before such insurance becomes applicable and a policy of insurance should not and cannot establish liability. That there was insurance in the instant case and that the father of the child limited recovery to the amount of the policy is not a valid reason for removing from the child its disability to maintain this action.

Automobile liability insurance imposes upon the insurer the duty to pay all sums for which the insured shall become obligated by reason of any liability imposed by law upon the insured. Absent legal liability on the insured's part, under the insurance contract no liability is imposed upon the insurer: *Kesman et al. v. Fallowfield Twp. School District*, 345 Pa. 457, 29 A. 2d 17. When the instant contract of insurance was issued the law imposed no liability upon the insured father nor mother for their negligent conduct resulting in damages to their child. The parties to the contract never contemplated any such coverage. Appellants would have the existence of insurance create a liability upon insured's part where none previously existed. To create such a post-contractual liability would be to vary the contract and thus "change the rules while the game is in progress". We refuse to impose a liability where none existed when the contract of insurance was issued.

While the existence of insurance coverage would relieve the possibility that the parent might suffer pe-

cuniary loss and to this extent lessen the possibility of family discord, yet at the same time the insurance coverage would impose upon the insured parent the duty of cooperating with the insurer. How could this clause be faithfully complied with without disturbing the family relationship which the policy of the law seeks to preserve? How could a parent conscientiously comply with the cooperation clause of the insurance policy and at the same time be mindful of his natural love and affection for the child, particularly when, as in the instant case, it is the parent who has become obligated for the medical, hospital and surgical expenses of the child? The self interest of the parent and his natural love and affection for the child would render nigh impossible any degree of cooperation with the insurer. The possibility of collusive action in such a situation in itself is sound reason for not rejecting the general rule where liability insurance is present.

Another and serious question confronts us in the present situation. Not only do we have a child, through its guardian, the father, maintaining a suit against the mother for the recovery of damages which belong to the child, but we have the husband-father maintaining a suit, in his own right, against the wife-mother for the recovery of damages which he, as the father of the child, has sustained by reason of the injuries to the child.

Under the Act of May 13, 1925, P. L. 638, §1, amending §1 of the Act of June 26, 1895, P. L. 316, 48 PS §91, the father and mother have a *joint* right of action for damages for injuries to a minor child, for loss of its services, and for the expenses incidental to such injuries and this right of action may be brought by either parent but in the name of both. Although it is highly questionable whether this suit was properly brought by the father in his own name, since the right is a *joint*

right, yet two much more serious questions present themselves: (1) since the action by the father in his own right to recover for a loss occasioned by injury to this child is for the injury done the parent, we have on this count of the present action a suit by a husband against a wife to recover damages in which the wife can share and (2) since the father in his own right accuses the wife of negligent conduct which caused the injuries to the child, the wife's negligence will bar recovery by the father.

It is for an injury done to the parents, not for an injury done the child, that the parents' action is maintainable: *Woeckner v. Erie Electric Motor Co.,* 182 Pa. 182, 37 A. 936. It necessarily follows that the parents' right is to recover compensatory damages for the pecuniary loss they have suffered by reason of the child's injury. Thus in the present action the father of the child is seeking a recovery of the pecuniary loss which was occasioned to both him and his wife and seeking it from the wife to whom part of such loss, if recovered, would be payable.

A husband cannot maintain a tort action against his wife. The common law prohibition of litigation between spouses has not been abrogated by the statutes removing the common law disabilities of married women so that one spouse can sue another in an action of tort: *Koontz v. Messer, etc.,* supra; *Kaczorowski v. Kalkosinski, Admr.,* supra; *Fisher v. Diehl,* supra. Since the right sought to be redressed by the husband is a right distinguishable from that of the minor child he cannot maintain this action against his wife. In addition it would be highly unconscionable to permit a recovery in this suit by the husband of a loss which belongs to both the wife and the husband and permit her to share in a recovery caused by her own wrong.

In *Connelly et al. v. Kaufmann and Baer Company*, 349 Pa. 261, 37 A. 2d 125, a suit for injuries suffered by a minor child instituted by the father, on behalf of the child and on his own behalf, we held that negligence on the part of the mother which contributed to the child's injury would bar a recovery by the father in his own right. The father's suit in this case is based on an allegation that his wife was negligent and such negligence caused the injury to the child; therefore, if such allegation were proven there could be no recovery by the father in his own right against the wife, even if such a suit were maintainable.

The public policy of this State precludes the institution of this type of intrafamily litigation. It is a sound policy and one to which we should strictly adhere, particularly in a situation where so much opportunity would exist for collusive action between members of a family if the rule were otherwise.

Judgments affirmed.

---

DISSENTING OPINION BY MR. JUSTICE MUSMANNO:

Twenty years ago I sat on the bench of the honored Court of Common Pleas of Allegheny County with the distinguished jurists, Judges PATTERSON and DITHRICH, and listened to arguments on the same question which confronts us in the case before us today. Jerome K. Minkin, an eight-year old boy had filed a suit in trespass, through his next friend, against his mother, charging her with negligence in driving the automobile which killed his father. The insurance company, which carried the policy indemnifying the mother against liability in automobile accidents, contested the suit, arguing, as is argued here, that a lawsuit by a child against its parents would violate sound public policy because such actions would tend to disrupt family unity

and tranquillity. My Common Pleas brethren were apparently impressed by this argument and they sustained the insurance company's demurrer. I dissented from my colleagues' decision, because it was not true that a suit by a minor against his parent would, per se, be disruptive of family harmony. Mrs. Minkin did not so contend. She did not object to being sued. When she purchased the automobile insurance in question she did not declare that the whole world could benefit from its provisions except her children. I said in my dissenting opinion: "Mrs. Minkin never believed, and certainly it was not so explained to her, that under the vast sheltering expanse of the umbrella of liability insurance there would be room for every one in the world —except her own children."

Jerome Minkin appealed to this court from the decision of the Court of Common Pleas, and this Court reversed, allowed Jerome to proceed with his claim, and, by doing so, upheld the opened umbrella.

Now, today, after 20 years, it has decided to close the umbrella. And as a consequence it accomplishes a grave injustice.

In the case at bar, Karen Ann Parks, a minor, has sued her mother, Mrs. Helen Parks, because of injuries sustained in an automobile accident resulting from the alleged negligence of her mother who drove the car. Luther F. Parks, the father, carries automobile insurance which includes his wife, so that any amount recovered by the child against her mother will be paid not by the mother but by the insurance carrier. The lower court dismissed Karen's action on the assertion that an unemancipated minor may not sue a parent in a tort action. The minor appealed to this Court, which has now affirmed the lower court's action in a decision which is not supportable in reason or law and is op-

posed to the most basic principles of evenhanded justice, as I intend to demonstrate in this opinion.

The Majority Opinion declares that "the public policy of this State precludes the institution of this type of intrafamily litigation. It is a sound policy and one to which we should strictly adhere, ..." My answer to that statement is that it is not a sound policy and therefore we should not adhere to it. The Majority sees no violation of public policy when a child sues his parent in assumpsit, but it perceives a violation when the lawsuit originates in tort. Where is the difference? If a child may sue his father because of a broken contract, why may he not sue him because of a broken leg? The Supreme Court of Ohio, in the case of *Signs v. Signs*, 156 Ohio 566, 576, well pointed out the absurdity involved in the arbitrary distinction, in this type of litigation, between a contract action and a tort action: "It seems absurd to say that it is legal and proper for an unemancipated child to bring an action against his parent concerning the child's property rights yet to be utterly without redress with reference to injury to his person.

"It is difficult to understand by what legerdemain of reason, logic or law such a situation can exist or how it can be said that domestic harmony would be undisturbed in one case and be upset in the other."

If the law throws no protective armor around parents in a contract action where they may be compelled to pay out thousands of dollars to their children, why should it build a defensive wall around them in a tort action where they would not be required to expend a penny? The Majority here does not attempt to explain (perhaps because it cannot) why a tort action should disrupt family unity while a contract action presumably does not. Countless pages in the law books are devoted to the description of pitched battles between children and parents over wills, inheritances, settlements,

partnerships, real estate, personal property and business deals of every character. Does the law close its eyes to this type of family disunity but open a jaundiced one to lawsuits involving recovery for a child's physical injuries? It is my opinion that the law is not so erratic, myopic, or astigmatic as the Majority Opinion would make it. The fault lies not in the law but in its interpretation.

Judges some times give to law an interpretation which invests it with a cunning and shrewdness wholly foreign to its purpose, because law, after all, in its fundamental concept, is simply justice in action. When judges make of the law something subtle and crafty they only succeed in making it insidious or ridiculous in the sight of a candidly-appraising lay world.

The Majority raises the banner of Public Policy in prohibiting child-parent tort actions. Let us suppose a situation, as I did in my dissenting opinion in the *Minkin* case, where a mother, possessed of a fortune of her own and estranged from her children, murdered her husband and thus deprived the children of maintenance and support. In such a case would Public Policy prohibit the children from suing the killer of their father? To that question I would answer in 1957 as I did in 1937 that: "Such a prohibition would not be public policy. It would be public outrage."

If the purpose of the law is to protect family unity, then it should have no objection to a lawsuit which tends to weld a family together even more closely, as is true in the case at bar. Moreover, in spite of the animadversions of the Majority against child-parent litigation, the fact remains that such litigation is by no matter of means strange to our courts. In the *Minkin* case this Court accepted what is common knowledge, namely, ". . . In this Commonwealth, children and parents appear against each other constantly in

criminal prosecutions, in desertion and non-support proceedings, as well as in proceedings in defense of property owned by them respectively."

Although there is considerable theorizing on the subject under discussion, there is nothing, in pragmatic reality, inherently wicked about a child suing his father or mother where the child has a proper grievance. The only substantial objection to this type of litigation lies in the fact that an intrafamily controversy could develop into an acrimonious contest since the parent might be required to pay money over to his child. But if that possibility is eliminated, wherein exists the danger of family disunity over a legal controversy? If the lawsuit between child and parent were simply an academic debate, no one would argue that it would or should cause family disunity. How does an academic debate differ from the present case where it is already pre-established that the parent will not be compelled to pay any money?

What difference would there be between a father putting money into a trust fund for just such a contingency—payment for injuries done to an injured child—and the purchase of insurance for the liquidation of a money verdict ascertained through legal proceedings? Once the father provides for settling a money verdict by means of a trust fund or an insurance policy, all reason for family disharmony has been removed. To insist, therefore, that, despite this patent lack of cause for discord, discord will nevertheless follow is simply to insist on a quibble, an illogicality, a non sequitur.

In arriving at its conclusion that Karen Parks has no right to bring an action in this case, the Majority says that at common law there was no rule that a child could not sue its parents. Although such a premise would better support my thesis of suability than the Majority's position of non-suability, it is not established

with historical immutability just what was a child's status in this respect at common law. Even the Majority admits, in a footnote, that "All the authorities are modern. What may be termed the earlier ones, those prior to 1891, are meager, conflicting and obscure." However, confronting the problem objectively today, it matters very little whether the parental tort immunity existed at common law or not. There was so much that was inhumane and cruel in the common law, with wives and children being regarded more or less as chattels, that citation pro or contra the thesis under present discussion cannot control it one way or the other. It is important, however, to note, as stated by the Majority, that the principle being advocated by it was not recognized in the American colonies and not accepted anywhere in the United States until 1891. In that year, in the State of Mississippi, a Mrs. Ragsdale had her daughter committed to an insane institution for disciplinary purposes. After ten days confinement the daughter was able to obtain her release. She then brought suit against her mother for false imprisonment, and recovered a verdict. The Supreme Court of Mississippi reversed, declaring: "The peace of society, and of the families composing society, and a sound public policy, designed to subserve the repose of families and the best interests of society, forbid to the minor child a right to appear in court in the assertion of a claim to civil redress for personal injuries suffered at the hands of the parent." (*Hewlett v. Ragsdale,* 68 Miss. 703, 711.)

The Mississippi Court did not cite any authority for its decision, it did not discuss the merits of the problem, it did not consider whether the child had been wronged through a wilful and malicious incarceration in an asylum for the insane. Arbitrarily it set up the standard that regardless of injuries suffered by a child

at the hands of parents, the courts would not countenance any claim against the parent.

Twelve years later in Tennessee a minor child brought suit to recover damages against her father and stepmother who had inflicted cruel and inhuman punishment upon her. Using the Mississippi case as a precedent, the Supreme Court of Tennessee declared that the suit could not be entertained. (*McKelvey v. McKelvey*, 111 Tenn. 390.) Then, two years subsequent to the Tennessee decision, a 15-year old girl in the State of Washington filed a suit in damages against her father who had criminally ravished her and for that offense had been sentenced to a term in the penitentiary. The daughter obtained a verdict which was reversed by the Supreme Court of Washington which declared: "The domestic relations of the home and family fireside cannot be disturbed by the members thereof, by litigation prosecuted against each other for injuries, real or imaginary, arising out of these relations." (*Roller v. Roller*, 37 Wash. 242, 244.)

If there is now a parental immunity rule in America it is built upon these three cases: one involving illegal confinement of a child in an insane asylum, the second having to do with inhuman punishment inflicted under the guise of parental discipline, and the third predicated upon the commission of an abhorrent and infamous felony. In the *Roller* case the Court said that "the domestic relations of the home and family fireside cannot be disturbed" by intrafamily litigation. What kind of family tranquillity, it may be asked could follow the harmony-shattering episodes in the three cases cited?

The Majority Opinion seeks to bolster its position with the statement that "the vast majority of courts in the United States deny any right to an unemancipated child to maintain a tort action against its parent:"

This statement is unquestionably correct but its mere announcement does not resolve the question before us. In the year 1491 A.D., the weight of world authority supported the geographical thesis that navigationally the earth was flat. Reason and logic, combined with cosmographical principles, challenged this thesis, and finally the voyage of the "Santa Maria" shattered it irretrievably. Later, Magellan's circumnavigation of the globe proved irrefutably the folly of the flat earth postulate. Similarly, a voyage through the decisions of other courts will reveal that those courts which support the parental tort immunity thesis are founded upon a principle which the juristic Columbuses and Magellans of today have proved to be utterly untenable in the light of modern realities. United States District Judge LORD, writing in the case of *Davis v. Smith*, 126 F. Supp. 497, well said: ". . . Where right and equity compel, it should not assist in perpetuating a doctrine which is, in large part, inhumane and unjust in our changing mode of life. This the authorities recognize."

The Majority Opinion arbitrarily asserts that by barring suits between parent and child, family unity is promoted, but it is not enough merely to make an assertion that a certain policy promotes family unity and avoids family discord. In the arena of the law no didactic assertion carries a spear of irrefutability. Before any assumed doctrine can wear the crown of infallibility it must prove itself invulnerable against attacks of all opposing contentions in the field against it. As against the parental immunity rule we have the respectable truths that children are special wards of the law, that there is no wrong without a remedy, that no one should be permitted to derive a benefit from his own wrong, that the law aims at realities, and that where the reason for a rule ceases to exist, the rule itself should fall. Thus, if there is a rule which con-

demns intrafamily litigation because it could create family discord, certainly that rule would be inapplicable where the facts show conclusively that the litigation would not only not stir up discord and disunity, but, on the contrary, would assure family harmony and happiness.

The plaintiff in this case, Karen Parks, has been so gravely injured in body and brain structure that in all likelihood she will never recover. She has been placed in an institution where she must have constant care. The expense connected with that type of care is enormous. Her father, Luther F. Parks, by taking out liability insurance, intended to underwrite the expenses for such care where the victim of his or his wife's negligence should require it. Does public policy proclaim that a father may make such provision for the children of other parents but not his own?

The fact that Karen Parks is a plaintiff against her mother can never become a source of family disharmony. Even if we were to assume, what is contrary to human nature, namely, that parents would resent spending money for a disabled child, we know that in this case the defendant mother would not be compelled to expend a dollar of her own money as the result of any verdict rendered against her. Where, therefore, would there arise any cause for family disharmony? In the case of *Dunlap v. Dunlap*, 84 N.H. 352, the plaintiff, 16 years of age, was injured while working for his father on a building construction job. He filed an action in trespass against his father. It was argued against the claim that to allow recovery would be to introduce disharmony into the family. The lower Court nonsuited the plaintiff, but the Supreme Court of New Hampshire, in a monumental decision, to which reference will be made later, said: "It is contrary to the facts to assert that such a suit would be a disturbing

factor in his family life. It is more likely to be viewed as something to be welcomed, as adding to the family assets."

The Majority Opinion, in an attempted buttressing of the decision of the Court in the case at bar specifies how a successful lawsuit would disrupt the life of the Parks family. It points out with particularity: "Family relationship is a two-way affair: parental devotion and care and affection may still flow toward the member of the family confined in the institution and this phase of family relationship may well be severed by litigation between the child and the parent."

With all respect, I must say that this is sheer sophistry. If this Court desires to lay down the arbitrary edict that under no circumstances will it permit a child to enter an action in tort against its parents, it should say so. It has the power to do so, although I doubt it has the authority. But in any event, a didactic finding of that character would be less disconcerting than an attempted explanation which offends reason, insults logic, and abandons justice. To say that a family relationship will be severed because an injured child is to receive money to buy medicine, to employ doctors, to hire nurses, to rent a hospital bed, and to do everything that science can do to restore vigor to a helpless frame and light the lantern of a darkened brain—is to say what is opposed to demonstrated phenomena, contrary to common knowledge, repugnant to the law of cause and effect, and antagonistic to established reality based upon love, reverence, and loyalty between parent and child. Why would a mother hate her child because, through payment of insurance money, her beloved offspring may have a chance to recover? Why would the child, Karen Ann, if her wounds ever heal and the frayed filaments of her brain ever re-knit, dislike her mother because, through medical care paid for by her

father she has been lifted from darkness into light, from a pit of pain onto a plain of happiness, from a living hell into a realized heaven?

The object of insurance is not only to protect the injured person; it is also to save the automobile owner from ruinous litigation and it is to give peace of mind to those motorists, who, having a conscience, want to provide for the people whom they may unintentionally injure. Insurance thus preserves tranquillity in both the family of the injured person and the family of the injuring person. If the law approves, as it does, of insurance where its operation benefits two families, why should it object where those benefits combine and concentrate in one family?

The Majority Opinion admits: ". . . the right of a minor child to maintain a tort action against a person who has the right of indemnity from or contribution from the child's parent in the event the child recovers damages in the action: Briggs et al. v. City of Phila. et al., supra, Cf: Koontz v. Messer and Quaker State Oil Refining Company, 320 Pa. 487, 181 A. 792; Fisher v. Diehl, 156 Pa. Superior Ct. 476, 40 A. 2d 912."

But if a parent may be added to the litigation where, as in the cases just cited, he must in the end pay the verdict, what happens to the rule which the Majority insists must prevail, namely, that a tort action against a parent must not be allowed? And if the parental immunity rule can be relaxed to the extent just indicated, why cannot it be relaxed where the parent, although nominally a defendant, will not be required to pay any part of the verdict at all?

The Majority Opinion says that there must be no relaxation of the rule, regardless of circumstance. With this assertion it controverts the universally accepted proposition that there can be an exception to any rule when conditions imperatively demand the exception.

When a ship collides with a rock all efforts are directed toward saving the ship, not the rock. Thus, when the acknowledged virtue of family harmony collides with a rule which will do untold damage to the family, it is the family which should be saved, not the rule.

In the days of slow and faulty transportation and communication, judges were hesitant to relax rules because they feared the relaxation might lead to abuses which they could not checkrein. However, in these days of rapid mails, telegraphy, and lightning printing presses, the law is instantly aware of developments which might cause improper extension of relaxed rules and it can act immediately to forestall untoward results.

The Majority Opinion says: "The minor child, Karen Parks, is now in a state institution and, therefore, appellants argue that there is not and cannot be any family relationship which would be disrupted by permitting this suit. Granted that the Complaint avers that 'it will be necessary that Karen Ann Parks be maintained in an institution for the remainder of her life,' that fact alone does not call for a relaxation of the rule." There is no indication that Mr. and Mrs. Parks are in such economic circumstances that they would be able from their own resources to meet the enormous expense of sustaining a helpless person in an institution permanently. Any solution, therefore, which will insure Karen's receiving proper medical care for the rest of her life will be a guardian angel not only for Karen but for the parents as well. Thus, to insist that such a solution will be disruptive of family harmony is to insist that a lifesaver thrown to a person struggling in the sea will drown him when we know that it will probably be the means of saving his life. Such an insistence is to say that a tourniquet properly applied will augment bleeding when we know that it

will stop bleeding. Such an insistence is to say that an oxygen tent will hinder the breathing of an ill person when we know that it will assist his breathing. Such an insistence makes a mockery of logic, a masquerade of reasoning, and a burlesque of argumentation.

The State of Maryland found no difficulty in relaxing the parental immunity rule when circumstances required it be relaxed. In the case of *Mahnke v. Moore,* 197 Md. 61, an illegitimate minor child sued the estate of her father to recover for shock and mental anguish sustained by her when her father killed her mother and then committed suicide in the child's presence. Conceding that parental authority should be maintained, the Supreme Court of Maryland declared that since the death of the parents left no family in which discipline and tranquillity was to be maintained, the reason for parental immunity had disappeared and, therefore, there was no purpose in applying the rule to bar recovery from the father's estate.

But, the Majority says in the case at bar: "Appellants lose sight of the fact that there is always a possibility of a resumption of the family relationship." Suppose there is such a resumption of family relationship. How would that change the fact that Karen Parks imperatively needs medical care and attention now and for the foreseen future? To deny a verdict today because ten, twenty, or thirty years from now, a physical condition may change (although conceded medical evidence is all to the contrary) is like denying food to a starving person on the assertion that he might possibly overeat and thus do himself considerable harm.

The Majority Opinion completely ignores the realities of the parent-child relationship. Like the judges of 1491 who accepted the popular notion that the earth was flat without attempting to analyze, consider, and

appraise the most modern findings and research on the subject, the Majority Opinion here declares that most of the States prohibit children from suing parents *in tort actions and, therefore, that* must be the correct rule. It makes no mention of the fact that one of the three States responsible for the rule, namely, the State of Washington, has repudiated it in the excellently reasoned decision of *Borst v. Borst,* 41 Wash. 2d 642, where the Court, speaking through Justice HAMLEY, said: "Since the family tranquillity argument is not considered as controlling where property rights are involved, it ought not to stand in the way where the claim relates to personal injuries . . . A second reason frequently advanced in support of the immunity rule is that actions by children against their parents tend to undermine parental authority and discipline . . . The field of parental control and discipline covers such matters as the maintenance of the home, chastisement, and no doubt other activities which need not here be delineated. But when the parental activity whereby the child was injured has nothing to do with parental control and discipline, a suit involving such activity cannot be said to undermine those sinews of family life. And even if such a suit should tend to impair family discipline in some degree, that would not seem to call for application of the immunity rule any more than in cases where the child sues to enforce a property right."

Although parents are central jewels in the diadem of family happiness, they have, like all other jewels, many facets. There are the facets of parental discipline, love and control, and then there are the facets of citizenship responsibilities, occupational and vocational duties, and liability to the world in general for harm done, intentionally or unintentionally. In the **obligations which the parent owes to society in general** his family is only an integer in the mass of all other

families. The taxes which he pays to the government do not benefit his family any more than they benefit other families. If he should commit a crime, his family cannot demand any severer punishment against him than that which the law imposes on any other person. But, by the same token, the family is not required to take less benefit than that which accrues to other families in the event a non-family obligation compels him to make a financial expenditure. Just as his own family, with all other families, enjoys the benefits of the taxes he pays, so should his own family enjoy the benefit of insurance which he buys for the protection of all families. If a man owns and operates a dangerous business such as, for instance, a dynamite factory and he is required to take out insurance to indemnify all property owners against damages they might suffer because of his hazardous business, it would be absurd to say that in the event of an accidental explosion which levelled a row of houses, which included his own, the insurance company would be required to indemnify all home-owners except the man who made the indemnification possible through the payment of premiums. Thus, in the same manner, it is simply preposterous to say that an automobile owner who carries insurance to indemnify children who may be injured through his negligence intends to protect all children except the fruit of his own loins.

When a father drives his automobile he is not travelling as a parent, he is simply a member of society owing equal obligations to all children on the street, not excluding his offspring. Whatever pain a child suffers in his home because of parental discipline has nothing to do with the pain he suffers on the street when he is run down by an automobile, including one owned by his father. The test, then, in cases of this kind is an obvious one, namely, where the child's injury arises

out of a normal parent-child relationship, no legal claim for redress is permissible, but where the injury is the outgrowth of a situation which could have arisen between strangers, recovery should not be denied. For instance, a father has the right to reprove his child for infraction of family discipline even to the extent of applying corporal punishment within reason, and it is nobody's business to interfere with that discharge of parental duty. If, in the enforcement of appropriate discipline, the child suffers personal humiliation or even minor bruises, that is the price he pays for the lessons he receives. But where the child is injured under conditions which have nothing to do with parental relationship, as, for example, if he loses an arm because his father commits an act of negligence at the automobile wheel, no possible kind of reasoning can justify refusing to the child the benefits of an insurance policy in which the merest stranger shares.

In the *Borst* case heretofore mentioned, a boy five years of age, was hit by a truck operated by his father. In the suit filed by the child against his father, a demurrer was sustained on the authority of *Roller v. Roller* (a leg of the tripod of cases supporting the parental immunity doctrine.) The Supreme Court of Washington analyzed the tripod leg and found it defective. The Court said while public policy "demands that parents be given immunity from such suits while in the discharge of parental duties," the mantle of immunity disappears "where the tort is committed by the parent while dealing with the child in a nonparental transaction."

In a word, a distinction must always be made between the delicate, particular parent-child relationship and general parent-society responsibility.

The Majority Opinion devotes a whole page or more to the enumeration of decisions of Courts of other

States supporting the tort parental immunity doctrine. It is an imposing list but, as Columbus swept away with a wave of his hand all the cobwebs of antiquated abstractions, miasmatic superstitions, and the unveriable majority views as to the shape of the earth, so will one or two thoroughly reasoned cases in the books nullify all the artificial and arbitrary conclusions which are found in the cases enumerated by the Majority Opinion. In its long discussion on authorities, the Majority Opinion failed to mention the "Santa Maria" of authorities, *Dunlap v. Dunlap,* 84 N. H. 352. A fleet of ships tracing its course from the light of the stars can not traverse the sea with the precision of one vessel guided by a compass. On the ocean of words spilled in discussion of the so-called parental immunity doctrine, the case of *Dunlap v. Dunlap* is a ship equipped with the compass of reasoning, the quadrant of logic, and the maps of truth-finding.

In that case the Supreme Court of New Hampshire admitted, as has the Majority of this Court, that "the great weight of recent American authority is . . . against the right to sue," but Chief Justice PEASLEE went on to say: "It is conceded of course that parental authority should be maintained. To this end, it is also conceded that the parent should not ordinarily be accountable to the child for a failure to perform a parental duty, and that vindication of personal rights should not be conceded to the child if it would impair the discharge of such duties. Thus far the reasons commonly denominated public policy carry the argument. For mistaken judgment as to the extent of chastisement, or for negligent disrepair of the home the father provides, there is usually no liability. These acts all grow out of and pertain to the relation of parent and child. The relation gives rise to the duty alleged to have been violated. . . . But there may be acts which clearly are not

to be referred to such relation. The father who brutally assaults his son or outrages his daughter, ought not to be heard to plead his parenthood and the peace of the home as answers to an action seeking compensation for the wrong. . . . the family peace idea has never been held to prevent certain suits by the child against the parent, and has been repudiated here as to suits between husband and wife . . . As often stated before, the sole debatable excuse advanced for the denial of the child's right to sue is the effect a suit would have upon discipline and family life. If, therefore, *the situation is such that the suit will not affect those matters at all, the reason for the theory fails and it should not be applied. There is such a situation here.*"*

*That* is the situation here also. As I have already suggested, it is chimerical in the extreme to argue that a suit by the infant Karen Parks against her mother could adversely affect discipline in the Parks home. The Supreme Court of New Hampshire said also: ". . . the essential fact which establishes the suability of the father is that he has provided for satisfying the judgment in some way which removes the suit from the class promotive of family discord." The essential fact in the case at bar is that Mr. Parks has provided for satisfying any judgment rendered against the mother in a way which removes the litigation from the class promotive of family discord.

I concur heartily with the observations of the Supreme Court of New Hampshire that:

"The communal family is held together and its continuity assured by something finer than legal command."

"The fear that the family structure will be undermined if the minor, while a member of the family, shall

---

. . . * Italics throughout mine, unless otherwise indicated.

gain the right to sue, is not justified by such experience as we have."

"For these reasons one may well question the soundness of the line of recent American cases denying a general accountability of the parent for either malicious wrongs or those caused by active intervention."

The Court of last resort in any State is charged with the responsibility of upholding the law. If an appellate court ignores precedent and authority and extends the thoroughfare of the law with decisions of arbitrary conclusions, based on no changing conditions, the highway of *stare decisis* will collapse and crumble into the waters of chaotic irresponsibility. Without well defined courses, specified directions, and established routes in the law, the traveller seeking justice could easily wander into quagmires and fall over unmarked precipices of disaster and ruin. Nevertheless it does happen from time to time that an appellate court is called upon to extend a certain jurisprudential road or alter an established route or stake out a new roadway over territory not heretofore traversed. Although this Court has already rendered decisions on related subjects and did, in the *Minkin* case, indicate a desired direction in cases of this kind, it has not yet laid down a solid and permanent turnpike through the terra incognita in Pennsylvania of tort parent-child relationship. This case offered the perfect opportunity for laying down the rule for all those who might find themselves in the unfortunate circumstance which this case reveals.*

---

* It had a similar opportunity to lay down a rule consonant with law and justice in the case of *Boorse v. Springfield Township*, 377 Pa. 109, but it failed to take advantage of that opportunity. In consequence, we now have the strange situation in Pennsylvania that a municipality may not be sued in tort for the negligence of its policeman if he is on foot, but the municipality is responsible

This case called for a surveying of the terrain, an examination of the topography, a testing of the earth for a determination as to the type and direction of the new highway. This Court refused to make such a survey. It was content to note that in a majority of the States, the highway travelled in a certain direction and therefore that direction must be correct, ignoring that in those states the indicated course carried the wayfarers to the same calamitous destination mapped out for the plaintiff in the instant case. The Majority was willing to overlook the splendid thoroughfare of reasoning in the State of Washington in the *Borst* case. It found no difficulty in averting its eyes from the excellently ballasted parkway of logic in New Hampshire in the *Dunlap* case. It insists on taking the law over the rough road interspersed with rocks of arbitrary conclusions, depressed with holes of non sequiturs, soggy with the waters of indifference to public welfare and individual justice. It refuses to glance at the magnificent boulevards built on this subject in the States of Maryland, West Virginia, Ohio, Oregon, Missouri, Georgia and Oklahoma.

In the case of *Lusk v. Lusk*, 113 W. V. 17, a 16-year old girl, who was injured in a school owned and operated by her father under a contract with the school board, brought an action against her father and was nonsuited. The Supreme Court of West Virginia reversed and said: "A maxim of the common law (and of the ages for that matter) is when the reason for a rule ceases the rule itself ceases (cessante ratione legis cessat ipsa lex.) There is no reason for applying the rule in the instant case. This action is not unfriendly as between the daughter and the father. A recovery by her

---

in damages if the policeman is in an automobile. *Stoops v. Muhorn*, 383 Pa. 132.

is no loss to him. In fact, their interests unite in favor of her recovery, but without hint of 'domestic fraud and collusion' (charged in some cases.) There is no filial recrimination and no pitting of the daughter against the father in this case. No strained family relations will follow. *On the contrary, the daughter must honor the father for attempting to provide compensation against her misfortune. Family harmony is assured instead of disrupted.* A wrong is righted instead of 'privileged'.

"When no need exists for parental immunity, the courts should not extend it as a gratuity. Without such an extension, nothing stands in the way of this action. It is familiar law that a child may bring to account the parent for wrongful disposition of the child's own property. *It must not be said that courts are more considerate of the property of the child than of its person (when unaffected by the family relationship.)*"

In the case of *Signs v. Signs,* supra, a boy seven years of age was injured through the negligent operation of a gasoline pump owned by his father. The child brought suit against his father and the question arose as to whether such litigation should be permitted. The Supreme Court of Ohio allowed the suit and said: "In these modern times, with the advent of the motor vehicle and the growing complications of business and industry and where in an industrial age we are living under changed conditions, it would seem a fantastic anomaly that in a case where two minor children were negligently injured in the operation of a business, one of them, a stranger, could recover compensation for his injuries and the other one, a minor child of the owner of the business could not."*

---

* A verdict later obtained was reversed because the child was a trespasser, but the principle of parental responsibility in tort was not disturbed.

In the case of *Cowgill v. Boock,* 189 Ore. 282, a boy 17 years of age lost his life when his father, apparently intoxicated, drove his car into a river and they both drowned. The administrator of the boy's estate filed an action against the administrator of the father's estate and recovered a verdict. The defendant appealed, urging non-liability in a parent-child relationship. The Supreme Court of Oregon affirmed the verdict and said that the rule of parental immunity in tort cases "should not be considered as an absolute one. As stated in the well considered case of *Lusk v. Lusk,* 113 W. Va. 17, 19, . . . 'we must not exalt this rule above ordinary common sense.' "

In the State of New York, it would appear that while an unemancipated child may still not sue a parent for "unintended personal injuries" sustained as a result of the parent's negligence, the rule has been relaxed to the extent that a suit will be entertained if it can be shown that the negligent act was performed "willfully, wantonly, and culpably." *Siembab v. Siembab,* 134 N. Y. S. 2nd. 437.

Recoveries have been allowed by children against parents in the cases of *Dix v. Martin,* 171 Mo. App. 266; *Wells v. Wells,* 48 S. W. 2d 109; *Wright v. Wright,* 25 Ga. Appeal 721; *Clasen v. Pruhs,* 69 Nebr. 278.

In *Davis v. Smith,* 126 F. Supp. 497, James W. Davis a minor, while a passenger in his father's automobile, was injured in an accident which killed the father. He brought an action in trespass against the father's estate for his injuries. His mother also sued for damages sustained by reason of her son's injuries. The administrator of the estate of the deceased father filed a motion to dismiss, inter alia, on the ground that the claimant did not state a cause of action since a minor child has no rights recoverable against a parent in trespass. Judge LORD of the United States District

Court, Eastern District, Pennsylvania, in a very scholarly and exhaustive Opinion held that the minor-plaintiff did set forth a valid legal claim, declaring: "The view of the more recent decisions and the modern legal authorities on the subject would appear to be that the rule of non-parental liability is to apply *only where the injuries occur while the parent is exercising his parental duty in the narrow sense.*" (Emphasis in original Opinion.)

The Majority apparently ignores the wholesome legal appeal of all these cases, the elementary justice of them, the logic and pristine reasoning which governs them, and is satisfied to go along with the States which, although predominating in number, found their decisions on the same fallacious theory, the same exploded hypotheses, and the same unrealistic surmises which form the basis for the decision in the case at bar.

Even if child-parent litigation had been at one time tabooed in Pennsylvania, that taboo was lifted in automobile accident cases by the Motor Vehicle Safety Responsibility Act of 1945. The plaintiff has well argued here that the parental immunity rule (if it ever existed) was modified when the Legislature provided that all motorists are required to take out insurance or be otherwise responsible for damages resulting from the negligent operation of motor vehicles. The Majority says that this argument is "farfetched." But I do not need any telescope to see the logic of the argument. The Legislature had but one object in enacting motorist financial legislation and that was to assure, to the extent that such assurance was possible, to every victim of a tortious automobile accident the financial fulfillment of the verdict which might be rendered against the motorists tortfeasor. In accordance with the provisions of the Act Mr. Parks purchased insurance to safeguard all the people in the State from the negligent

operation of a motor vehicle by himself or by his wife. His own child was perforce included in that protected group. The Legislature made no exception. On what basis, then, does the Majority make an exception? By what authority does the Majority say that out of all the population of Pennsylvania which could be injured through the Parks' negligence everyone could recover against him but his own child? Where does the Majority find that exception in the statute, where does it locate it in accepted law, where does it discover it in the fields of logic, where does it meet upon it in the whole world of justice?

The Majority says that the fact "a parent is covered by insurance is irrelevant since liability must exist before such insurance becomes applicable and a policy of insurance should not and cannot establish liability." But the whole purpose of the financial responsibility legislation is to protect victims of negligence on the highways. Naturally liability must precede payment, naturally the trial must come before the verdict, naturally the verdict must go before the payment, naturally the horse goes before the cart. But how is there to be a trial and a verdict—how is there to be the establishment of liability unless the injured child is permitted to maintain a legal action?

The whole Majority Opinion gives evidence of being guided by a fetish and not by a principle of established law. It has nailed to the masthead of its argument the shibboleth of "Family Unity" and although the ship is heading for the rocks and shoals of family disunity and disaster, the Majority assumes it will be held together simply because the ship is sailing under the flag of parental absolutism.

As in 1491 the anti-Columbian theorists conjured up, against a westward voyage, the hazards of oceanic

whirlpools, ferocious sea animals, and submarine drag-
ons, the Majority sees in child-parent litigation the le-
gal monsters of collusion, conspiracy and intrigue. It
says that if a child is permitted to sue its parents who
carry insurance, the parents and offspring will join
forces and cooperate to sink the insurance company. In
this respect the Majority travels in two opposing direc-
tions. Firstly, it argues that if child-parent litigation
is permitted, the family will be torn asunder and cut
to pieces; and then it argues that if child-parent liti-
gation is not prohibited the family unity will be weld-
ed together in an indissoluble union fighting the insur-
ance company. The Majority would travel east and
west simultaneously.

While travelling westwardly, the Majority says that
insurance coverage imposes upon the insured parent the
duty of cooperating with the insurance company, and
then it asks: "How could a parent conscientiously com-
ply with the cooperation clause of the insurance policy
and at the same time be mindful of his natural love
and affection for the child . . .?" The Majority here
takes upon itself an awesome and, I must say, a most
unwarranted assumption. It assumes that in each case
where there is insurance coverage the insurance com-
pany demands that the insured defendant deny respon-
sibility for the accident. The Majority practically says
that so long as there is insurance, the injured person
must be in the wrong and the insured motorist in the
right. Therefore, if the insured concedes in any way
that he was wrong this is proof of noncooperation with
the insurance company and that this amounts to proof
of collusion with the victim of the accident. This is
an appalling interpretation. It almost amounts to par-
tisanship. Certainly it is a conclusion which is op-
posed to everyday experience. Insurance companies are
constantly settling cases because the facts, as related

by the insured as well as by other witnesses, reveal liability on the part of the motorist.

It would appear that the Majority is more concerned about the possibility of collusion than it is about the disharmony of family because it mentions collusion three or four times in its opinion. But upon what basis does it make this charge of collusion, for it cannot be regarded as anything other than an accusation? The Majority suggests distortion of testimony, perjury of witnesses. Upon what does it predicate such serious charges? There is not the slightest or remotest scintilla of suggestion in the whole record that there is or would be collusion between the parties in this lawsuit. But, let us assume for the purpose of the argument there could be the *possibility* that the mother would lie in order to give her child a verdict. Must there not also be conceded the possibility that the facts would be presented in court honestly and without coloration or exaggeration? On what basis can this Court deny a right just because of one possibility that is offset by another possibility, both of which go before a court and jury for impartial adjudication?

There is always the possibility of collusion, of fabrication and of falsification in court, but with able and zealous attorneys on either side, misconduct is not the prevalent factor which this Court would seem to suggest it is. The best of friends sue each other, brothers and sisters frequently appear on opposite sides of the counsel table, aunts, uncles, nephews, godfathers and godchildren are often adversaries in litigation but no one suggests that such litigation should be outlawed because of the possibility of collusion.

The Majority Opinion insists that "The possibility of collusive action in such a situation in itself is sound reason for not rejecting the general rule where liability insurance is present." This is a strange position indeed

for an appellate court to take, namely, that because of the *possibility* (without any proof whatsoever for suggesting that possibility), of collusion, the courthouse should be closed to victims of motor accidents where the parental relation is involved.

The Majority conjures up a complicated, labyrinthian problem which, after four long paragraphs of involved argumentation regarding a husband's inability to sue his wife, ends up by saying that "It would be highly unconscionable to permit a recovery in this suit by the husband of a loss which belongs to both the wife and the husband and permit her to share in a recovery caused by her own wrong." The one-sentence answer to the four paragraphs is that the wife would not be sharing in a recovery caused by her own wrong. The father is liable for expenses incurred and to be incurred in behalf of the child-plaintiff, and he would be entitled to a verdict to cover such expenses. The mother as a defendant would not be entitled to any recovery, and would not receive any part of the verdict. Why it would be unconscionable for the father to receive what the law authorizes him to receive is a mystery which I am unable to fathom from the Majority Opinion. A study of the *Minkin* case, which the Majority cites, and to which I refer at the beginning of this Dissent, will supply the answer to the Majority's assumed dilemma. In that very case the query raised here by the Majority was discussed, considered, and disposed of. In that case, this Court pointed out that in order to allow a minor child to sue its mother, the mother should be added as a party plaintiff. In that case this Court said that a mother could be a plaintiff and a defendant at the same time. Here are this Court's words: "Defendant's suggestion of a procedural difficulty that she may not sue herself is not substantial. She is placed, by the legislature, in nominal control of the action but, when

there are children, she conducts the suit in a representative capacity, just as in some states an administrator is required to bring the suit as the representative of the parties for whose benefit the legislation allows recovery." Justice LINN, writing for the Court, explained: "She [the mother] cannot be heard to complain that she is required to exercise a right given to her child by law; as plaintiff, she must act as a fiduciary."

Thus the Majority's observation on unconscionability of the wife-defendant's sharing in the verdict in this case is entirely superfluous. She would not share in the verdict. As was said in the *Minkin* case, which the Majority cites but does not follow: "If it be shown, as the statement of claim avers, that the cause of the father's death was the defendant-mother's negligence, she, in her own right, can take nothing in the suit; but the fact that she has disabled herself from sharing, will not deprive the other beneficiary—the minor—of the benefit of his statutory right to recover."

The momentous question in Pennsylvania of parental responsibility for tort has been decided in this case not on law but on shibboleth. The Majority Opinion calls for peace in the family when, with injury and death at the hearthstone, the mantle of tranquillity has already been rent. It calls for family unity when the silver cord of family happiness has already been broken. It calls for strengthening of the pillars of the family when the roof has already caved in and then prohibits the employment of means which are ready, willing, and able to rebuild the roof and re-furnish the home with health, harmony, and contentment.

The facts in the case at bar and the problems which they raised took this Court to the gates of a great decision, but the Court refused to open the gates. It took the Court to the bridge of a definitive, forward-looking

position on contractual and tort rights, but it refused to cross the bridge. It took the Court to a needed turn in the road in order to avoid the quicksands of injustice. The Court declined to take the turn.

I most emphatically dissent.